THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL SCHMIDT, Defendant-Appellant.

First District (3rd Division)    No. 1—06—2563

Opinion filed June 17, 2009.

Michael J. Pelletier and Anne E. Carlson, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald, Alan J. Spellberg, and Ramune Rita Kelecius, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MURPHY delivered the opinion of the court:

Defendant, Michael Schmidt, was convicted of felony murder, aggravated possession of a stolen motor vehicle, and aggravated battery

after he fled from the police in a stolen sport utility vehicle (SUV) and struck a family that was crossing the street, killing six-year-old Alexander Diaz and injuring four other members of the Diaz family. Defendant was sentenced to concurrent terms of 40 years' imprisonment for the murder, 15 years for aggravated possession of a stolen motor vehicle, and 5 years for each of the aggravated batteries. On appeal, defendant argues that (1) aggravated battery not resulting in great bodily harm, the underlying felony for his felony-murder conviction, was not a forcible felony; (2) he was not proven guilty beyond a reasonable doubt of felony murder or aggravated battery; (3) the State made improper comments during closing and rebuttal arguments; and (4) the judge failed to question potential jurors in accordance with *People v. Zehr*, 103 Ill. 2d 472 (1984). He does not challenge his conviction for aggravated possession of a stolen motor vehicle. For the following reasons, we affirm in part and reverse in part.

## I. FACTS

Defendant was charged in a 35-count indictment with first-degree murder, attempted first-degree murder, aggravated possession of a stolen motor vehicle, burglary, aggravated driving under the influence of alcohol, reckless homicide, and aggravated battery. The State proceeded at trial on the charges of felony murder, aggravated possession of a stolen motor vehicle, and aggravated battery. The felony-murder charge was predicated on the aggravated battery of Chicago police officer Michael Yzaguirre, who was hit by the side mirror of the SUV when defendant sped away attempting to elude the police.

At trial, Felicita Diaz testified that on October 12, 2004, she was walking with her children to the store. Gabriella, 6 months old, was strapped into a stroller; Alexander, 6, was holding onto the stroller on the left side; Margarito, 7, held onto the right side; and Leticia, 12, walked behind the stroller with Felicita. At the northwest corner of Greenview and Sunnyside, a four-way stop, Felicita stopped and looked both ways before crossing south. As they approached the sidewalk on the other side of the street, she heard a loud noise and saw a truck moving quickly at them. Alexander said, "Mommy, a car." Before she could do anything, the truck struck the family and threw them to the ground.

After she was hit, she looked for her children. She found Leticia and Margarito lying on the ground and the stroller broken and upside down in the road. She then took Gabriella out of the stroller and continued to look for Alexander. She found him unresponsive on the grass by the stop sign that the truck had run over. She started yelling for help. She saw three men getting out of the truck and asked them

in Spanish to help her. She turned to look at Alexander, but when she turned to the truck again, the three men were gone.

Alexander died at the scene from a broken neck and massive head injuries. Leticia suffered from a broken ankle, and Margarito, Gabriella, and Felicita all had bruises.

Mary App testified that on October 12, 2004, she was walking outside her apartment on Greenview toward Wilson. She lived in the area and described the neighborhood as quiet and residential, with around 30 or 40 young families living there. As she walked, she saw a large black SUV driving "very quickly" in her direction "wobbling back and forth." The SUV looked like it was trying to slow down but was going "way too quickly" when it attempted a right turn. As a result, the truck "went in a diagonal direction," ran over a stop sign, and hit a church. Although the intersection had a four-way stop, the SUV did not stop.

There was a family walking across the street; when they saw the SUV, they started running and screaming loudly. She did not see the family again "until a couple of them started to sprawl out." App saw a girl hobbling around with a broken foot or leg, screaming loudly. The mother was clutching a baby, also screaming loudly. Someone had to "drag" a boy out who was bleeding from his nose, ears, and the top of his head. No one from the SUV stopped to help the injured family.

Christopher Anleu testified that on October 12, 2004, at 5 p.m., defendant and Joe Garcia visited him at his house. Anleu testified that neither he, defendant, nor Garcia was a member of the Latin Kings street gang in October 2004, although defendant probably hung around with members of the gang. The three watched television and drank from a gallon of vodka, which they did not finish. Defendant left after 45 minutes and said he would be back. He returned 30 to 45 minutes later with a Lexus truck and asked if they wanted to go cruising. Anleu did not know that it was stolen because defendant had a key. The owner of the SUV testified that the valet keys were in the glove compartment.

Anleu testified that at the intersection of Wilson and Clark, defendant stopped at the light and yelled to some friends who were on the sidewalk on the other side of the street. A man approached the driver's side of the car, and as he got closer, Anleu realized that the man was a police officer. The officer, standing by the driver's side rearview mirror, told defendant to stop the car, but defendant drove away "pretty fast" down Wilson. When defendant pulled away, Anleu heard a thump from the area of defendant's side mirror. He heard someone say, "F--k, the cop got hit" or "I think I hit the cop," but he was not sure who said it. As defendant drove quickly down Wilson, he said that the car was stolen and "f--k, 5-0" was coming.

Defendant continued driving "pretty fast." When he attempted to turn down a side street, he lost control of the car and hit a church. After the truck hit the building, defendant commented that the car was "f--ked up." Anleu, "intoxicated, like, to an extreme," walked toward Ashland, where he heard sirens, while defendant and Garcia fled. Anleu testified that he did not see any people in the road before defendant lost control of the truck.

Officer Michael Yzaguirre testified that on October 12, 2004, at 8 p.m., he was on the corner of Wilson and Clark dressed in civilian clothes and a bulletproof vest, with his badge hanging around his neck. As he spoke to someone suspected of gang activity, he heard tires screeching and saw a large SUV come out of an alley. The SUV stopped at the traffic light, and the driver, whom he identified as defendant, leaned out of the window, made a Latin Kings hand signal, and yelled, "Latin Kings, what you about?" Yzaguirre approached the SUV from the front, with his jacket open so defendant could see that he was a police officer. As he stood with his left hip touching the driver's side front fender, he yelled "Police, put the car in park." When defendant dropped his hands to his lap, Yzaguirre drew his weapon and said, "Police, let me see your hands." When defendant raised his hands, Yzaguirre ordered him to turn the SUV off. However, defendant dropped his hands into his lap again, and Yzaguirre said once again, "Police. Let me see your hands."

Defendant raised his hands, but the light had changed, so defendant "floored his vehicle and came right at me." Yzaguirre leaned back, but the mirror hit his left forearm and knocked him back two feet. Yzaguirre testified that the SUV then proceeded westbound on Wilson and north on Greenview at a "very high rate of speed." Yzaguirre and his partners quickly went to their car and tried to chase defendant. When they arrived at Sunnyside and Greenview, they saw the SUV up against a wall, having run over a stop sign. The Diaz family was on the ground. Witnesses pointed west on Sunnyside; when he looked in that direction, two men looked at him and fled. Yzaguirre and his partner chased and apprehended the two men, Anleu and Garcia.

Within the hour, defendant was found hiding on the porch of an apartment building on Greenview. His fingerprint was found on the exterior of the front passenger's side window of the SUV.

Later that night, Yzaguirre was treated and released for muscle contusions to his shoulder. He was still sore the next day. The parties stipulated that Dr. Alison Stewart, the emergency room doctor who treated Yzaguirre, concluded that he suffered from a contusion to the left shoulder. Stewart stated that during the examination, Yzaguirre

said he was standing on the front passenger end of a vehicle, facing the driver, when the driver pulled away. He said that the side mirror hit his left forearm and pulled and twisted his left shoulder backward. Yzaguirre complained of pain in his left shoulder.

Chicago police officer Patrick Kearns testified that he was working with Yzaguirre on October 12, 2004. He heard screeching tires and saw a large SUV coming out of an alley. Defendant was driving, and two other men were passengers. Defendant flashed gang signs with his hands and yelled "Latin King love." Yzaguirre approached the SUV, with Kearns six to eight feet behind him, and yelled "Police" and told defendant to put the car in park. Defendant's hands were in and out of view several times; when defendant refused to keep his hands up and turn the SUV off, both Yzaguirre and Kearns drew their weapons. Defendant sped off, driving straight and not swerving. The side mirror hit Yzaguirre's left arm.

The jury convicted defendant of aggravated possession of a stolen motor vehicle; felony murder predicated on the aggravated battery of Yzaguirre; and aggravated battery of Yzaguirre and Felicita, Gabriella, Margarito, and Leticia Diaz. The trial court sentenced him to concurrent terms of 40 years' imprisonment for the murder, 15 years for aggravated possession of a stolen motor vehicle, and 5 years for each of the aggravated batteries.

## II. ANALYSIS

### A. Forcible-Felony Statute

First, defendant argues that his felony-murder conviction should be reversed because the aggravated battery underlying his felony-murder conviction was not a forcible felony. Before trial, defendant challenged the felony-murder count of the indictment, which was predicated on the aggravated battery of Yzaguirre, arguing that it failed to state a cause of action because aggravated battery not involving great bodily harm could not serve as a forcible felony. See 725 ILCS 5/111—3(a)(3) (West 2004) (a charging instrument must set forth the nature and elements of the offense charged).

■ A person who kills an individual without lawful justification commits first-degree murder if, in performing the acts that cause the death, he or she is attempting or committing a forcible felony other than second-degree murder. 720 ILCS 5/9—1(a)(3) (West 2004). A "forcible felony" is defined as:

> "treason, first degree murder, second degree murder, predatory criminal sexual assault of a child, aggravated criminal sexual assault, *** burglary, residential burglary, aggravated arson, arson, aggravated kidnaping, kidnaping, aggravated battery resulting in

great bodily harm or permanent disability or disfigurement and any other felony which involves the use or threat of physical force or violence against any individual." 720 ILCS 5/2—8 (West 2004).

In addition, the aggravated-battery statute (720 ILCS 5/12—4 (West 2004)) provides that an aggravated battery can occur in several ways. Specifically, subsection 12—4(a) of the Criminal Code of 1961 provides that a "person who, in committing a battery, intentionally or knowingly causes great bodily harm, or permanent disability or disfigurement commits aggravated battery." 720 ILCS 5/12—4(a) (West 2004). Subsection (b) requires the commission of a simple battery accompanied by certain factors, such as the use of a deadly weapon other than a firearm (720 ILCS 5/12—4(b)(1) (West 2004)); knowledge that the victim is a police officer (720 ILCS 5/12—4(b)(6) (West 2004)); or a battery on a public way (720 ILCS 5/12—4(b)(8) (West 2004)). Defendant was charged with, and the jury was instructed on, the aggravated battery of Yzaguirre in violation of subsections (b)(1), (b)(6), and (b)(8).

The primary goal in construing a statute is to ascertain and give effect to the intent of the legislature. *People v. Richardson*, 196 Ill. 2d 225, 228 (2001). Legislative intent is best ascertained by examining the language of the statute itself. *People v. Belk*, 203 Ill. 2d 187, 192 (2003). Where the language is clear and unambiguous, there is no need to resort to aids of statutory construction. *Belk*, 203 Ill. 2d at 192. In interpreting a statute, a court should "consider, in addition to the statutory language, the reason for the law, the problems to be remedied, and the objects and purposes sought." *People v. Donoho*, 204 Ill. 2d 159, 171-72 (2003). Because the construction of a statute is a question of law, our review is *de novo*. *Belk*, 203 Ill. 2d at 192.

Defendant contends that the aggravated battery underlying the felony-murder conviction was not a forcible felony because it did not result in great bodily harm or disability to Yzaguirre. The State concedes that the aggravated battery did not result in great bodily harm or disability to Yzaguirre but claims that it falls within the residual clause for "any other felony which involves the use or threat of physical force or violence against any individual." 720 ILCS 5/2—8 (West 2004).

■ We agree with defendant, however, that by using the word "other" after listing 14 specific felonies, the legislature clearly intended the residual category to refer to felonies not previously specified. Where the statute specifically enumerated aggravated battery resulting in great bodily harm or permanent disability or disfigurement, "other felony" must refer to felonies other than aggravated battery. While the State argues that section 2—8 defines "forcible felony"

as "*any* felony involving the threat or use of physical force or violence against any individual," this argument ignores the phrase "any *other* felony."

The 1990 amendment to the forcible-felony statute supports defendant's position. Before 1990, the forcible felony statute provided that *all* aggravated batteries constituted forcible felonies. In 1990, the legislature enacted Public Act 86—291, which added the phrase "resulting in great bodily harm or permanent disability or disfigurement" after "aggravated battery." Pub. Act 86—291, eff. January 1, 1990. Therefore, while the earlier definition included all aggravated batteries, after the amendment, only those aggravated batteries "resulting in great bodily harm or permanent disability or disfigurement" were among the enumerated forcible felonies. We agree with defendant that, by enacting the 1990 amendment, the legislature expressed its intent to limit the number and types of aggravated batteries that would qualify as forcible felonies. The jury was instructed on the aggravated battery of Yzaguirre based on three theories: use of a deadly weapon other than a firearm (720 ILCS 5/12—4(b)(1) (West 2004)); knowledge that the victim is a police officer and that he was engaged in the execution of his official duties (720 ILCS 5/12—4(b)(6) (West 2004)); and battery on a public way (720 ILCS 5/12—4(b)(8) (West 2004)).

We conclude that the aggravated battery of Yzaguirre was not a forcible felony and, therefore, reverse his murder conviction. However, we reiterate that "[a]lthough we believe our interpretation is what the legislature intended, we would welcome further clarification by the legislature." *People v. Jones*, 226 Ill. App. 3d 1054, 1056 (1992).

## B. Felony Murder of Alexander Diaz

Defendant alternatively argues that his conviction for first-degree murder should be reversed or reduced to reckless homicide because the State failed to prove beyond a reasonable doubt that his conduct constituted a forcible felony. Even though we reversed defendant's felony-murder conviction on other grounds, we elect to discuss this second point.

When a court considers a challenge to a criminal conviction based on the sufficiency of the evidence, its function is not to retry the defendant. *People v. Milka*, 211 Ill. 2d 150, 178 (2004). Rather, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Woods*, 214 Ill. 2d 455, 470 (2005). Under this standard, a reviewing court must draw all reasonable inferences from the record

in favor of the prosecution. *People v. Bush*, 214 Ill. 2d 318, 326 (2005). A court of review will not overturn the fact finder's verdict unless "the proof is so improbable or unsatisfactory that there exists a reasonable doubt of the defendant's guilt." *People v. Maggette*, 195 Ill. 2d 336, 353 (2001).

As explained above, the aggravated battery of Yzaguirre was the predicate felony for defendant's felony-murder conviction. A person who kills an individual without lawful justification commits first-degree murder if, in performing the acts that cause the death, he or she is attempting or committing a forcible felony other than second-degree murder. 720 ILCS 5/9—1(a)(3) (West 2004). Under the felony-murder rule, a felon is responsible for the direct and foreseeable consequences of his actions. *People v. Lowery*, 178 Ill. 2d 462, 470 (1997). "The object of the felony murder statute is to limit the violence that attends the commission of felonies, so that anyone engaging in that violence will be automatically subject to a murder prosecution, should a murder occur during the commission of a [forcible] felony." *People v. Shaw*, 186 Ill. 2d 301, 322 (1998), citing *People v. Dennis*, 181 Ill. 2d 87, 105 (1998).

We agree with defendant that *People v. Belk*, 203 Ill. 2d 187 (2003), further precludes his felony-murder conviction. In *Belk*, residents of a nearby apartment complex heard the defendant breaking into a vehicle and called the police. The police pursued the stolen van, which drove 100 miles per hour in an area with a speed limit of 30 miles per hour, where numerous restaurants and other establishments were still open for business. There was other vehicular traffic present on that street and pedestrians on the sidewalk. At an intersection, the defendant crashed into the rear of the victims' car, propelling it 375 feet from the point of impact and killing the two occupants. Toxicology tests revealed that the defendant had a blood-alcohol level of 0.19. The trial court found the defendant guilty of two counts of felony murder predicated on aggravated possession of a stolen motor vehicle.

On appeal, the defendant argued that his conviction should be reduced to reckless homicide because aggravated possession of a motor vehicle was not a forcible felony for purposes of the felony-murder rule. Our supreme court noted that aggravated possession of a motor vehicle is not an enumerated forcible felony; therefore, it had to determine whether aggravated possession of a motor vehicle fell within the residual category of section 2—8. *Belk*, 203 Ill. 2d at 193. The court, citing its earlier holding in *People v. Golson*, 32 Ill. 2d 398 (1965), noted:

> " '[T]he test to be applied in determining whether the felony-murder doctrine is applicable is not whether the felony is normally

classified as non-violent, but is whether, under the facts of a particular case, *it is contemplated that violence might be necessary to enable the conspirators to carry out their common purpose.*' " (Emphasis in original.) *Belk*, 203 Ill. 2d at 193-94, quoting *Golson*, 32 Ill. 2d at 407-08.

The defendant was intoxicated, stole a van, and, in an effort to elude capture, drove at an excessive rate of speed through an area where he was likely to encounter traffic. *Belk*, 203 Ill. 2d at 195. The court held:

"While this evidence would support an inference that Belk acted recklessly and contemplated that in attempting to elude police he was likely to cause death or great bodily harm, an inference that clearly supports a conviction for reckless homicide pursuant to section 9—3 of the Code (720 ILCS 5/9—3 (West 1996)), it does not support an inference that Belk contemplated that the use of force or violence against an individual might be *necessary* in order for him to accomplish his escape." (Emphasis in original.) *Belk*, 203 Ill. 2d at 195.

The court rejected the State's argument that, in light of *People v. Stevens*, 324 Ill. App. 3d 1084 (2001), and *People v. Thomas*, 266 Ill. App. 3d 914 (1994), the defendant's conduct should be considered a forcible felony under the circumstances of that case. In those cases, the defendants were fleeing police in stolen vehicles when they were in accidents resulting in the victims' deaths. They were convicted of first-degree murder pursuant to section 9—1(a)(2) of the Criminal Code of 1961, which provides that a person commits first-degree murder when he knows that his actions created a strong probability of death or great bodily harm. 720 ILCS 5/9—1(a)(2) (West 2004). The court found that the State's reliance was misplaced: "While a defendant's knowledge that his actions create a strong probability of death or great bodily harm is sufficient to support a conviction for first degree murder under section 9—1(a)(2) of the Code, a defendant's knowledge that his actions *might* involve the threat or use of force or violence against an individual is not sufficient, under *Golson*, to make a felony a forcible felony under section 2—8." (Emphasis in original.) *Belk*, 203 Ill. 2d at 197. Therefore, under the facts of that case, aggravated possession of a motor vehicle was not considered a forcible felony, and his conviction was reduced to reckless homicide.

The *Belk* court distinguished *Golson*, 32 Ill. 2d 398, and *People v. Bongiorno*, 358 Ill. 171 (1934), both of which held that the defendants contemplated the use of deadly force in carrying out their common purpose or in escaping with the proceeds of the robbery:

"The crucial distinction between the present case and *Bongiorno* and *Golson* is that, in those cases, the surrounding circumstances, particularly the fact that the perpetrators were armed, gave rise to

an inference that [they] intended to use force to escape. This necessarily implies that they contemplated that the use of force or violence against an individual might be involved and that they were *willing* to use such force or violence in order to make their escape." (Emphasis in original.) *Belk*, 203 Ill. 2d at 195-96.

See also *People v. Belk*, 326 Ill. App. 3d 290, 295 (2001) (distinguishing cases "where the defendants were armed with guns and deliberately used them when they were facing arrest"). The defendant in *Belk* was not armed, and "[w]hile it is true that a vehicle can be used as a deadly weapon," there was no evidence that the defendant contemplated using the van in such a manner. *Belk*, 203 Ill. 2d at 196. Although there were pedestrians on the sidewalk, there was no evidence that he contemplated that striking a pedestrian with the van might be necessary to elude the police. *Belk*, 203 Ill. 2d at 196. In addition, there was no evidence that the defendant contemplated that striking another vehicle might be necessary to accomplish his escape. *Belk*, 203 Ill. 2d at 196. Indeed, a high-speed collision with another vehicle would not only impede an escape attempt, but it would also present a serious risk of death to the perpetrator. *Belk*, 203 Ill. 2d at 196.

In the instant case, defendant's conduct in eluding the police, while causing tragic consequences, was less egregious than the conduct that the supreme court found merely reckless in *Belk*. The intoxicated defendant in *Belk* drove the stolen van 100 miles per hour in an area with a speed limit of 30 miles per hour, even though there were other cars on the street and pedestrians on the sidewalk. As in *Belk*, defendant had been drinking heavily before the accident. Indeed, defendant was initially charged with two counts of aggravated driving under the influence and one count of reckless homicide, which were nol-prossed. In addition, the only evidence as to the excessive speeds that defendant was driving was that he drove at a "very high rate of speed" and "way too quickly," according to witnesses. While defendant drove at this "very high rate of speed" for a couple of blocks, the police chased the *Belk* defendant for much longer, from 127th Street and Vincennes to 111th Street and Western Avenue. Most telling is the fact that defendant, like the defendant in *Belk*, was unarmed. While the SUV could be considered a deadly weapon, here, as in *Belk*, there was no evidence that defendant contemplated that striking a pedestrian with the SUV might be necessary to elude the police. *Belk*, 203 Ill. 2d at 196. Accordingly, we conclude that, under the facts of this case, defendant did not "contemplate[ ] that the use of force or violence against an individual might be necessary in order for him to accomplish his escape." (Emphasis omitted.) *Belk*, 203 Ill. 2d at 195; 720 ILCS 5/2—8 (West 2004).

The State urges us to follow *People v. Hall*, 291 Ill. App. 3d 411 (1997). In *Hall*, the defendant pistol-whipped Kenneth Eggleston, the victim of the aggravated battery, and the gun discharged, killing the murder victim, Lazaric Eggleston. On appeal, Hall argued that aggravated battery while using a deadly weapon was not a forcible felony and could not serve as the predicate offense for felony murder because it did not result in great bodily harm or permanent disability or disfigurement to the victim of the aggravated battery. The court rejected his argument and invoked the residual clause of section 2—8: "[D]efendant's aggravated battery of [Kenneth] certainly involved the use or threat of physical force or violence against [Kenneth]." *Hall*, 291 Ill. App. 3d at 418. Accordingly, the aggravated battery was a forcible felony that could properly serve as the predicate offense for a felony-murder conviction. *Hall*, 291 Ill. App. 3d at 418.

We find that the State's reliance on *Hall* is misplaced. Hall's pistol-whipping of Kenneth certainly placed Lazaric in danger, but we are at a loss as to how hitting Yzaguirre placed the Diaz family in danger. Further, not only was *Hall* decided several years before the supreme court decided *Belk*, but it also involved the use of a firearm, which *Belk* found to be a "crucial distinction." *Belk*, 203 Ill. 2d at 195-96. In addition, while *People v. Greer*, 326 Ill. App. 3d 890, 895 (2002), found that "the mere presence of a gun during the commission of a felony does not determine whether the crime is a forcible felony," it, too, was decided before *Belk*, which seems to suggest the contrary. See *Belk*, 203 Ill. 2d at 195-96 (citing *Golson* and noting that "the surrounding circumstances, particularly the fact that the perpetrators were armed, gave rise to an inference" that they intended to use force).

We hold that, under the facts of this case, defendant did not "contemplate[ ] that the use of force or violence against an individual might be necessary in order for him to accomplish his escape." (Emphasis omitted.) *Belk*, 203 Ill. 2d at 195; 720 ILCS 5/2—8 (West 2004). See *People v. Rodriguez*, 258 Ill. App. 3d 579 (1994); *People v. Leahy*, 229 Ill. App. 3d 1070, 1075 (1992) ("The linchpin is the absence of evidence that the defendant faced a battery on a public way *resulting in great bodily harm, disability, or disfigurement*" (emphasis in original)). Therefore, although we already reversed defendant's felony-murder conviction above because the aggravated battery of Yzaguirre was not a forcible felony, we further find that the evidence presented at trial, considered in the light most favorable to the prosecution, shows that defendant acted recklessly before and at the time of the fatal collision and that his actions do not come within the purview of the felony-murder statute. *Belk*, 326 Ill. App. 3d at 296.

In our previously issued opinion, we reduced defendant's conviction for first-degree murder to reckless homicide (720 ILCS 5/9—3(a) (West 2004)), citing *Belk*, 326 Ill. App. 3d at 296, and Supreme Court Rule 615(b)(3) (134 Ill. 2d R. 615(b)(3)). We then remanded the case to the trial court for resentencing. *People v. Schmidt*, No. 1—06—2563, slip op. at 16-17 (March 11, 2009) (unpublished order under Supreme Court Rule 23). In a petition for rehearing, defendant argued that because we held that the felony murder charge failed as a matter of law, we should have ended our analysis and reversed defendant's first-degree murder conviction outright.

In its response, the State argued that we had the authority to reduce defendant's conviction to reckless homicide. The State further argued that because defendant asked this court to reduce his first-degree murder conviction to reckless homicide, his request in his petition for rehearing for outright reversal should be rejected under the doctrine of invited error. See *People v. Carter*, 208 Ill. 2d 309, 319 (2003). In his reply, defendant asserted that he had only asked for this court to consider reckless homicide as an alternative if we rejected his initial argument that the felony-murder charge failed as a matter of law. Defendant also noted that we agreed with his initial argument.

Upon reconsidering our decision in light of the petition for rehearing, the State's response, and defendant's reply, we now reverse outright defendant's first-degree murder conviction.

## C. Aggravated Battery

Defendant was charged with and convicted of the aggravated batteries of Yzaguirre and the four surviving Diazes. Defendant argues that the State failed to prove him guilty beyond a reasonable doubt of aggravated battery because the evidence was insufficient to establish that he "knowingly" caused bodily harm to the victims. Rather, defendant contends, the State's evidence showed that he acted recklessly.

A person commits a battery if he intentionally or knowingly causes bodily harm to an individual or makes physical contact of an insulting or provoking nature with an individual. 720 ILCS 5/12—3(a) (West 2004). Section 12—4 provides that a "person who, in committing a battery, intentionally or knowingly causes great bodily harm, or permanent disability or disfigurement commits aggravated battery." 720 ILCS 5/12—4(a) (West 2004). Subsection (b)(6) provides that a person commits aggravated battery if, in committing a battery, he knows

> "the individual harmed to be a peace officer *** while such officer *** is engaged in the execution of any official duties including

arrest or attempted arrest, or to prevent the officer \*\*\* from performing official duties, or in retaliation for the officer \*\*\* performing official duties, and the battery is committed other than by the discharge of a firearm[.]" 720 ILCS 5/12—4(b)(6) (West 2004).

Pursuant to subsections (b)(1) and (b)(8), a person commits aggravated battery if the battery is committed on a public way or with a deadly weapon other than by the discharge of a firearm. 720 ILCS 5/12—4(b)(6), (b)(8) (West 2004). The indictment charged defendant with violations of subsections (b)(1) and (b)(8) as to Felicita, Gabriela, and Margarito; subsections (b)(1), (b)(6), and (b)(8) as to Yzaguirre; and subsections (a), (b)(1) and (b)(8) as to Leticia.

■ A person acts knowingly or with knowledge of (1) the "nature or attendant circumstances of his conduct, described by the statute defining the offense, when he is consciously aware that his conduct is of such nature or that such circumstances exist" or (2) "the result of his conduct, described by the statute defining the offense, when he is consciously aware that such result is practically certain to be caused by his conduct." 720 ILCS 5/4—5 (West 2004). "Knowledge of a material fact includes awareness of the substantial probability that such fact exists." 720 ILCS 5/4—5(a) (West 2004). Knowledge can be inferred from the surrounding facts of the case. *People v. Burrett*, 216 Ill. App. 3d 185, 190 (1991). On the other hand, a person acts recklessly when he "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense." 720 ILCS 5/4—6 (West 2004). Whether a defendant acted knowingly or recklessly may be inferred from circumstantial evidence, and "inferences as to defendant's mental state are a matter particularly within the province of the jury." *People v. DiVincenzo*, 183 Ill. 2d 239, 252-53 (1998). "It is the jury's function to determine the accused's guilt or innocence, and this court will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of defendant's guilt." *People v. Frieberg*, 147 Ill. 2d 326, 359 (1992).

### 1. *Yzaguirre*

Defendant contends that the State failed to prove beyond a reasonable doubt that he knowingly caused bodily harm to Yzaguirre. According to defendant, he acted recklessly rather than knowingly when he drove away from the intersection and the side mirror hit Yzaguirre's arm.

We find that any rational trier of fact could have found that defendant was "consciously aware" that Yzaguirre was "practically certain" to be hit by the SUV when defendant sped away from the

intersection. While defendant makes much of the fact that he drove straight ahead instead of swerving to hit Yzaguirre, the officer was so close to the SUV that his hip was touching the driver's side front bumper. Thus, defendant did not need to swerve to hit him. In fact, while defendant drove straight, he certainly did not swerve to *avoid* the officer.

Defendant also argues that the force of the blow suggested that he had no reason to believe that his actions would cause an injury to Yzaguirre. Defendant contends that although Yzaguirre testified that he was hit in the forearm, "apparently he sustained no injury whatsoever to it." To the contrary, Yzaguirre was treated for muscle contusions to his shoulder, and he continued to experience soreness the next day. The emergency room doctor who treated Yzaguirre corroborated that he suffered from a contusion to the left shoulder. While defendant claims that the force with which Yzaguirre was hit had to be minimal, he did not merely drive away in a normal manner after the traffic light had changed; he sped off at a high rate of speed to elude the police.

Defendant also relies on the apparent conflict in the evidence as to where Yzaguirre was standing when defendant sped off. Yzaguirre and his partner testified that they were on the driver's side of the car, while the emergency room doctor who treated Yzaguirre said that he told her he was standing on the front passenger end of a vehicle, facing the driver, when the driver pulled away. Not only is it for the jury to resolve conflicts in the evidence such as this one (*People v. Holmes*, 141 Ill. 2d 204, 243 (1990)), but the emergency room doctor's account was internally inconsistent; if Yzaguirre had been on the passenger side of the SUV facing the driver, his right arm, not his left, would have been closest to the side mirror when defendant drove away. Furthermore, defendant's friend, Christopher Anleu, corroborated Yzaguirre's and his partner's accounts when he testified that the officer was on the driver's side of the car when defendant fled.

Defendant also claims that the surrounding circumstances show that he had no motive for wanting to hit Yzaguirre's arm. According to defendant, by injuring an officer, he virtually guaranteed that he would be "vigorously pursued" by other officers, which was contrary to his goal, since he was driving a stolen vehicle and was, most likely, intoxicated. As the State points out, however, the most predictable course of action for someone who already committed two serious crimes in the presence of the police is to "take his chances and flee in the hope of evading any legal consequences for his conduct whatsoever," especially since the officers had not yet ascertained his identity. Equally unsuccessful is his argument that the "weapon" used had

little likelihood of causing bodily harm because mirrors that "protrude beyond the body of a motor vehicle are not designed as weapons and are frequently involved in unintentional bangs and scrapes." It is well settled that a vehicle can be used as a deadly weapon (*Belk*, 203 Ill. 2d at 196), and no evidence was presented to prove that the side mirrors in the SUV in question folded inward or that his view of the officer's forearm "might well have been obstructed by the vehicle's left, front A-pillar."

We also reject his argument that the comments he made after hitting Yzaguirre showed that he was not "practically certain" to cause bodily injury to Yzaguirre, since he was "surprised" and "not pleased" that he had hit an officer. Anleu testified that after he heard the thump by the side view mirror, defendant said, either "f—k, the cop got hit" or "I hit the cop" and, seconds later, "f—k, 5-0 is coming." These comments are all declarations of fact, and defendant has not shown how expressions of displeasure about the consequences of his criminal conduct negate the "knowing" mental state.

*People v. Cameron*, 189 Ill. App. 3d 998 (1989), is instructive. In *Cameron*, the police stopped the defendant and permitted him to get back into his truck so he could turn off the motor. Instead, the defendant sped away with the passenger door still open. An officer was standing next to the truck when the defendant sped away, and the truck doorjamb struck his wrist, knocking him back a few steps and causing him to require medical treatment. On appeal, the defendant argued that the State failed to prove the requisite mental state for aggravated battery. The court rejected the defendant's argument, finding that the jury could have reasonably found that he was (1) "consciously aware" that his passenger side door was open and (2) "consciously aware" that the officer was "practically certain" to be hit by some portion of the vehicle when the defendant drove off. *Cameron*, 189 Ill. App. 3d at 1008. "The evidence the passenger side door was open and that [the officer] was standing next to the truck in the open doorway when defendant suddenly started the truck and sped away is crucial to our decision that the evidence supported the verdict finding defendant guilty of aggravated battery." *Cameron*, 189 Ill. App. 3d at 1008.

■ Similarly, the evidence here shows that when defendant sped off, Yzaguirre was standing with his left hip touching the driver's side front fender. Yzaguirre leaned back, but the mirror hit his left forearm and knocked him back two feet. Furthermore, defendant was aware of Yzaguirre's location and his status as an officer before he drove away: Yzaguirre had been standing next to the SUV with his gun pointed at defendant, and defendant responded to Yzaguirre's commands to "let me see your hands." While defendant attempts to distinguish *Cam-*

*eron* because the officer in that case was hit by a car door instead of a side mirror, the evidence is even more compelling here, where Yzaguirre was on the same side of the SUV as defendant and, thus, far more visible.

The evidence established that defendant was "consciously aware" that Yzaguirre was "practically certain" to sustain bodily harm as a result of being hit by the SUV's side mirror. See 720 ILCS 5/4—5 (West 2004). Therefore, we affirm defendant's conviction for aggravated battery of Yzaguirre.

### 2. *Leticia, Margarito, Gabriella, and Felicita Diaz*

■ Defendant also contends that the State's evidence was insufficient to prove that he "knowingly" caused bodily harm to Leticia, Margarito, Gabriella, and Felicita Diaz. According to defendant, he acted recklessly rather than knowingly because he could not have known that he would be unable to sufficiently slow the SUV; that this inability would result in the SUV traveling "sideways"; or that, once traveling sideways, the SUV would do so in a manner to strike the Diaz family.

Defendant relies on *In re T.A.B.*, 181 Ill. App. 3d 581 (1989), in support of his argument. In *T.A.B.*, the respondent was convicted of criminal damage to property after he took his foster father's car, drove 70 miles per hour, and clipped the bumper of another car before hitting a telephone pole. The respondent testified that when he saw the other car, he attempted to shift gears to slow down but was unable to do so, and then he hit the brakes, but the tires locked. On appeal, the respondent argued that the State failed to establish the requisite mental state, since he did not "knowingly" damage either car. The court held that although the evidence indicated that the respondent was driving at a "highly excessive" rate of speed, "it cannot be said that he was consciously aware that he was practically certain to damage the two automobiles in question as a result." *T.A.B.*, 181 Ill. App. 3d at 585. He did not deliberately damage either car since he did swerve in an attempt to avoid hitting the other car. *T.A.B.*, 181 Ill. App. 3d at 585. "While traveling 70 miles per hour on a street with a speed limit of 35 miles per hour would substantially increase one's chance of becoming involved in an accident, it would not make such an occurrence a practical certainty." *T.A.B.*, 181 Ill. App. 3d at 585. The respondent's conduct may have been negligent or even reckless, but the evidence failed to demonstrate that he knowingly damaged either car. *T.A.B.*, 181 Ill. App. 3d at 585.

The State, on the other hand, relies on *People v. Arsberry*, 242 Ill. App. 3d 1034 (1993). In *Arsberry*, the defendant robbed a store and

then fled from the police. An officer testified that the defendant was driving in excess of 60 miles per hour. The car veered onto a curb, hitting the base of a stoplight, and continued on the sidewalk for 100 feet, where it headed into a crowd of people and struck two people. Although a man was on the ground and a woman was on the hood of the car, the defendant's car drove 60 miles per hour for an additional 14 blocks, with the woman on the hood. When the car hit a railroad sign and some cement pillars, the woman fell off the car. The defendant was convicted of aggravated battery of both people that he struck with the car. On appeal, he argued that his aggravated-battery convictions should be reversed because the State failed to prove that he acted intentionally or knowingly.

This court disagreed, noting that the defendant, "traveling in dangerous excess of the speed limit," drove onto the sidewalk, striking two people. *Arsberry*, 242 Ill. App. 3d at 1041. "Undeniably, an individual who drives at such high rates of speed, between 60 and 70 miles per hour, cannot lack the conscious awareness that he might hit someone or something." *Arsberry*, 242 Ill. App. 3d at 1041. Furthermore, the defendant drove for 14 blocks with a woman clinging to the hood of the car before she was eventually thrown off the car and onto the pavement. *Arsberry*, 242 Ill. App. 3d at 1041. "We cannot [say] that defendant was not consciously aware that driving at such high speeds with a person on the hood of his car would not result in serious bodily harm to that individual." *Arsberry*, 242 Ill. App. 3d at 1041. Accordingly, we affirmed the defendant's convictions for aggravated battery. *Arsberry*, 242 Ill. App. 3d at 1041.

We find that this case is more similar to *T.A.B.* than *Arsberry*. Like the defendant in *T.A.B.*, defendant attempted to slow down but failed because he was driving too fast. Furthermore, while the defendant in *Arsberry* was driving 60 to 70 miles per hour, here, there was no evidence as to the speed limits or estimates of the speed defendant was driving, except that he was driving at a "very high rate of speed," according to Yzaguirre, and "way too quickly," according to App. In addition, defendant did not drive onto a sidewalk, the inherent purpose of which is to hold solely pedestrians; rather, he ran a stop sign and barreled through a crosswalk. In addition, although it was a pleasant October evening, no evidence was presented that the residential area that defendant drove through was presently "crowded with people," as it was in *Arsberry*. Defendant drove at a "very high rate of speed" and "way too quickly" for a couple of blocks, whereas the defendant in *Arsberry* drove on the sidewalk for 100 feet and an additional 14 blocks at a dangerously excessive speed with a woman clinging to his hood.

We conclude that defendant's conduct in injuring the four surviving members of the Diaz family was reckless, not knowing. Therefore, we reverse defendant's convictions for aggravated battery of Leticia, Margarito, Gabriella, and Felicita Diaz.

## D. State's Closing Argument

■ Next, defendant argues that he was denied his right to a fair trial when the State, during closing and rebuttal arguments, understated its burden, argued facts not in evidence, shifted the burden of proof to defendant, ridiculed the theory of defense, and urged the jury to convict based on the irrelevant issue of gang violence.

"[D]efendant faces a substantial burden in attempting to achieve reversal [of his conviction] based upon improper remarks made during closing argument." *People v. Williams*, 332 Ill. App. 3d 254, 266 (2002). Prosecutors enjoy wide latitude in closing arguments. *People v. Caffey*, 205 Ill. 2d 52, 131 (2001). In reviewing comments made at closing arguments, this court asks whether they "engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). A reviewing court will not reverse a jury's verdict based on improper remarks made during closing arguments unless the comments resulted in substantial prejudice to the defendant and constituted a material factor in his conviction. *People v. Brooks*, 345 Ill. App. 3d 945, 951 (2004).

Defendant first argues that the State misstated the law of aggravated battery by minimizing its burden of proving that he "knowingly" caused bodily harm. See *People v. Kuntu*, 196 Ill. 2d 105 (2001); *People v. Buckley*, 282 Ill. App. 3d 81, 89 (1996); *People v. Gutirrez*, 205 Ill. App. 3d 231, 264 (1990). He contends that this misstatement is especially prejudicial given that the only issue at trial was whether his conduct was reckless or knowing, since defense counsel conceded that defendant had recklessly driven the stolen SUV, bumped Yzaguirre's arm, and hit the Diaz family. This is the only statement from the State's closing argument that was properly preserved with both a contemporaneous objection and specific mention in the posttrial motion. See *People v. Pinkney*, 322 Ill. App. 3d 707, 715 (2000).

During closing argument, the State commented, "Oh, it's not my fault. I was reckless. Not my fault. Gee, I didn't know somebody could get killed if I ran a stop sign and I went too fast." In rebuttal, the State argued:

> "Make no mistake, folks. They try to tell you well, he didn't swerve to hit him. You know what? You don't have to swerve to hit him. They are confusing intentional with the element of knowingly.

\*\*\* We are not saying that he intentionally tried to run him over; *he just disregarded anything that could happen to that police officer.* \*\*\* So, we are not saying that he intentionally tried to run him over; but you know what? He knew that if he went forward, *he would run the risk* of hitting him. \*\*\* [W]e don't have to prove that he intentionally tried to run him over. Just that he wanted to get out of there any way possible and *he knew the risk* when he went straight forward that that officer can get hit." (Emphasis added.)

Defendant objected to these statements, and the trial court overruled the objections.

A person acts with "knowledge" of the result of his conduct when he is consciously aware that such result is practically certain to be caused by his conduct. 720 ILCS 5/4—5 (West 2004). A person acts recklessly when he "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense." 720 ILCS 5/4—6 (West 2004). While there is some element of risk inherent in both the "knowing" and "reckless" mental states, the State's arguments that defendant knew the "risk" and that he "disregarded" it seem to trace the language of section 4—6, which defines recklessness.

Defendant contends that the prejudice resulting from these comments was exacerbated because the trial court overruled the objections and refused to give an instruction defining "knowingly," and because defense counsel explained "knowledge" incorrectly. Defendant cites defense counsel's comment that the State was required to prove that defendant knew his actions "were likely to cause harm. Not a faint idea that he was being dangerous, but that it was likely to produce this exact harm." However, defense counsel also overstated the State's burden several times when he argued that the State had to prove that defendant knew that he "would" hit Yzaguirre and the Diaz family. "Would" suggests a certainty instead of the "substantial probability" and "practical certainty" in the definition of "knowing."

"[I]mproper arguments that result in substantial prejudice to the defendant can constitute reversible error." *Buckley*, 282 Ill. App. 3d at 90. The test to determine whether the State's misstatement of the law constituted substantial prejudice to the defendant is whether the jury would have reached a contrary verdict had the improper statement not been made. *Buckley*, 282 Ill. App. 3d at 90. In *Buckley*, the court relied on the "closely balanced nature of the evidence" instead of "objective evidence that the jury would have reached a contrary verdict." *Buckley*, 282 Ill. App. 3d at 90. Here, the evidence is not closely balanced as to the convictions for aggravated possession of a

stolen motor vehicle and the aggravated battery of Yzaguirre, defendant's remaining convictions. At the stop light, defendant quickly drove forward, even though a police officer—wearing a badge around his neck and pointing his gun at defendant—was right next to the driver's side fender. The circumstances indicate that defendant was "consciously aware" that bodily harm to Yzaguirre was "practically certain" to result.

Defendant also complains about a number of other comments made by the State in closing. However, we find that he failed to properly preserve these arguments when he failed to object at trial and/or made only general allegations in his posttrial motion, which referred to "prejudicial inflammatory and erroneous statements in closing argument." See *Pinkney*, 322 Ill. App. 3d at 715. Defendant's arguments as to these comments are forfeited; plain error did not occur, as the evidence was not close, and the comments did not deprive him of a fair trial.

### E. *Zehr* Principles

■ Finally, defendant argues that his conviction should be reversed because the trial court did not question prospective jurors about the principles enumerated in *Zehr*, 103 Ill. 2d 472.

In *Zehr*, the court held that "essential to the qualification of jurors in a criminal case is that they know that [the] defendant is presumed innocent, that he is not required to offer any evidence on his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify [on] his own behalf cannot be held against him." *Zehr*, 103 Ill. 2d at 477. If a juror has a bias against any of these basic guarantees, an instruction given at the end of the trial will have little effect. *Zehr*, 103 Ill. 2d at 477.

The supreme court amended Supreme Court Rule 431(b) in 1997 to ensure compliance with the requirements of *Zehr*. 177 Ill. 2d R. 431, Committee Comments, at lxxix. As amended, Rule 431(b) provided, "If requested by the defendant, the court shall ask each potential juror, [either] individually or in a group," whether he or she understand the *Zehr* principles enumerated above. 177 Ill. 2d R. 431(b). In *People v. Williams*, 368 Ill. App. 3d 616, 623 (2006), this court held that the "rule does not require the judge to ask the questions unless defendant's counsel has asked the court to do so."

The supreme court again amended Rule 431(b) in March 2007, effective May 1, 2007, by deleting the language "if requested by the defendant" from the beginning of the paragraph. 177 Ill. 2d R. 431(b); Ill. S. Ct. R. 431(b) (eff. May 1, 2007). Thus, Rule 431(b) currently imposes a *sua sponte* duty on the trial court to question each individual

juror as to whether he or she understands the *Zehr* principles. *People v. Gilbert*, 379 Ill. App. 3d 106, 110 (2008). "Such questioning of the potential jurors is no longer dependent upon a request by defense counsel." *Gilbert*, 379 Ill. App. 3d at 110.

Defendant was tried in 2006, before the effective date of the 2007 amendment. He contends that this court should apply this amendment retroactively.

The first step of the retroactivity analysis is "to determine whether the legislature has clearly indicated the temporal reach of the amended statute." *People v. Atkins*, 217 Ill. 2d 66, 71 (2005). The amendment to Rule 431(b) that imposed the *sua sponte* duty on the trial court to question each potential juror as to the *Zehr* principles was adopted on March 21, 2007, and had an effective date of May 1, 2007. In *Gilbert*, we held that by "delaying its implementation, the supreme court expressed the intent that the amended rule would apply prospectively only." *Gilbert*, 379 Ill. App. 3d at 111. Therefore, the trial court's *"sua sponte* duty to question each potential juror regarding his understanding and acceptance of the *Zehr* principles applies only to *voir dire* conducted on or after the amended rule's effective date of May 1, 2007; it does not apply retroactively to *voir dire* conducted prior to May 1, 2007." *Gilbert*, 379 Ill. App. 3d at 111. In *People v. Yarbor*, 383 Ill. App. 3d 676 (2008), we agreed with *Gilbert* and noted that if the current Rule 431(b) were applied retroactively, "then all pending direct appeals from a jury trial would be subject to reversal and a new trial. We presume that the supreme court did not intend such an application." *Yarbor*, 383 Ill. App. 3d at 684.

At the time of defendant's trial, the trial court was required to ask each potential juror about the four *Zehr* principles "[i]f requested by the defendant." 177 Ill. 2d R. 431(b); *Williams*, 368 Ill. App. 3d at 623. Defendant's attorneys did not make a request for *Zehr* questioning. Therefore, the trial court complied with Rule 431(b) that was in effect at the time and there was no error.

Defendant alternatively contends that he was denied effective assistance of counsel when his attorneys failed to request that the trial court question the jurors about the *Zehr* principles. A defendant alleging ineffective assistance of counsel must demonstrate that counsel's representation fell below an objective standard of reasonableness and that, but for counsel's errors, there was a reasonable probability that the outcome of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 686, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). There is a strong presumption that counsel's performance fell within a wide range of reasonable professional assistance. *Strick-*

*land*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. A failure to satisfy either prong precludes a finding of ineffective assistance. *People v. Patterson*, 192 Ill. 2d 93, 107 (2000).

In *People v. Benford*, 349 Ill. App. 3d 721 (2004), the trial court neglected to inform the jurors that the defendant's failure to testify cannot be held against him; however, it did explain the presumption of innocence, the State's burden to prove the defendant guilty, and that the defendant is not required to offer any evidence in his own behalf. The court did not inquire of the jurors individually as to whether they could abide by the legal principles, nor did defense counsel request the court to inquire. Nevertheless, this court found that the defendant did not suffer from ineffective assistance of counsel: "Under Rule 431(b) and *Zehr*, defendant's decision to ask jurors individually as to whether they understand and accept the principles of law is not mandatory, but optional." *Benford*, 349 Ill. App. 3d at 733. "Here, defense counsel elected not to exercise his right to pose individual questions." *Benford*, 349 Ill. App. 3d at 733. Similarly, in *Yarbor*, this court concluded that we "do not find defendant's attorney ineffective since Rule 431(b) was optional." *Yarbor*, 383 Ill. App. 3d at 686.

Furthermore, the trial court informed the jury about the presumption of innocence and that the State has the burden of proving him guilty beyond a reasonable doubt. Before opening statements, it informed the jury that defendant was not required to offer any evidence on his own behalf. Before deliberations, the trial court reiterated these principles and informed the jury that defendant's failure to testify on his own behalf could not be held against him. Since the jury was made aware of these principles before deliberations and "defendant's decision to ask jurors individually as to whether they understand and accept the principles of law is not mandatory, but optional" (*Benford*, 349 Ill. App. 3d at 733), we find that defendant was not denied effective assistance of counsel.

## III. CONCLUSION

In summary, we affirm defendant's convictions and sentences for aggravated possession of a stolen motor vehicle and the aggravated battery of Yzaguirre, and we reverse his convictions for felony murder of Alexander Diaz and aggravated battery of Leticia, Margarito, Gabriella, and Felicita Diaz.

Affirmed in part and reversed in part.

THEIS and QUINN, JJ., concur.