# Illinois Official Reports

## Appellate Court

---

### *People v. White*, 2015 IL App (1st) 131111

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SAMUEL WHITE, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-13-1111 |
| Filed<br>Rehearing denied | December 16, 2015<br>February 8, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-9459; the Hon. Thaddeus L. Wilson, Judge, presiding. |
| Judgment | Affirmed in part; vacated in part; cause remanded. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Rachel M. Kindstrand, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Tasha-Marie Kelly, and Edward Wasilewski, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE LAVIN delivered the judgment of the court, with opinion.<br>Presiding Justice Mason and Justice Pucinski concurred in the judgment and opinion. |

**OPINION**

¶ 1 Following a bench trial, defendant Samuel White was found guilty of being an armed habitual criminal as well as two counts of armed violence, unlawful possession of a weapon by a felon, and two counts of possession of a controlled substance. After determining that several counts merged, the trial court imposed three concurrent 18-year prison terms for the armed habitual criminal offense and the two counts of armed violence. On appeal, defendant asserts that the evidence was insufficient to sustain all three convictions because each of those offenses required the State to prove defendant had a handgun and the police officer's testimony that he saw defendant with a handgun was contrary to human experience. Defendant also asserts that the evidence was insufficient to sustain his armed habitual criminal conviction because his underlying conviction for domestic battery did not constitute a necessary predicate offense. Defendant further asserts that one or both of his armed violence convictions should be vacated and that his sentence was excessive.

¶ 2                            I. BACKGROUND

¶ 3 Defendant was charged with being an armed habitual criminal in that on March 21, 2012, he "knowingly or intentionally possessed a firearm, to wit: [a] handgun, after having been convicted of aggravated domestic battery under case number 09CR-22130 and first degree murder under case number 94CR-14140." We note that the conviction under case number 09CR-22130 was actually for domestic battery, not aggravated domestic battery. Additionally, defendant was charged with one count of armed violence based on possessing 5-Methoxy-N, N-Diisopropyltryptamine while armed with a handgun and another count of armed violence based on possessing N-Benzylpiperazine while armed with a handgun. Furthermore, defendant was charged with two counts for separately and unlawfully possessing those same controlled substances as well as unlawful use of a weapon by a felon.

¶ 4 At trial, Officer Brian McDevitt testified that at about 10 p.m. on March 21, 2012, he was working with Officer May and Officer Carey in an unmarked car. Officer McDevitt was in civilian dress but was wearing a ballistics vest bearing a police insignia. Additionally, Officer McDevitt's duty belt and firearm were visible. His partners were similarly dressed. At about 10:30 p.m., the officers responded to a call of shots fired in the area of 6535 South California Avenue. Although the officers observed no one in the courtyard at that address, they saw defendant and another man in the next courtyard over at 6527 South California Avenue. No other individuals were in the area. Furthermore, street lamps lit the courtyard and nothing obstructed Officer McDevitt's view.

¶ 5 He quickly walked into the courtyard, which he described as being about 20 feet wide by 50 feet deep, and approached the two men with his gun drawn. Officer McDevitt then saw defendant reach into his waistband, remove a "small silver handgun with light shining from the metal," and walk toward the building's door. Despite seeing a handgun, Officer McDevitt did not immediately inform his partners that defendant was armed. At some point, Officer McDevitt ordered defendant to stop. That fact, however, was not included in the police report. After defendant opened the door to the building and threw the handgun inside, he

walked a few steps away from the entrance. Officer Carey secured defendant and the other individual together, while Officer McDevitt opened the door to the building.

¶ 6    Inside the building, a second door with a lock separated the hallway from the apartments, although it was possible that the door was not locked. In addition, Officer McDevitt retrieved a loaded silver .22-caliber handgun from the hallway floor. No other items were in the area and the handgun looked like the item that defendant removed from his waistband. After securing the weapon, Officer McDevitt performed a custodial search of defendant, which revealed 1 clear plastic bag holding 12 smaller bags of suspect cannabis and another bag holding 6 multicolored pills containing suspect Ecstasy. The parties later stipulated that the substances found on defendant's person contained cannabis, 5-Methoxy-N, N-diisopropyltryptamine, and N-Benzylpiperazine. Officer McDevitt further testified that defendant said the gun belonged to him but he had not known it was in his immediate possession. Moreover, defendant said he had heard gunshots but that examining his handgun would confirm that it had not been fired. The individual with defendant was permitted to leave when a search revealed no contraband. Officer McDevitt did not run a check on either man's name and did not know whether the other officers did.

¶ 7    The State then submitted a certified copy of defendant's 1997 conviction under case number 94 CR 1414003 for committing first degree murder, and purported to submit a certified copy of his 2010 conviction under case number 09 CR 2213001 for "Class 4 aggravated domestic battery." With that said, the certified copy of conviction included in our record shows that defendant had actually been charged under "720-5/12-3.2(a) (1)" with a Class 4 felony of "Domestic BTRY/Bodily Harm PRI." Defendant was sentenced to two years' probation and six months in prison for that prior conviction.

¶ 8    Barbara Taylor testified on defendant's behalf that on the night in question, she was with her sister, Fairy Stennis, and her friend, Diane Walton. The three women were talking and listening to music with the windows down in Stennis' car, which was parked in front of Walton's apartment building at 6527 South California Avenue. In addition, defendant was sitting in a chair in the courtyard and Taylor could hear him searching through music on his phone. Taylor knew defendant through Walton, with whom he had an amorous relationship. Although another man was standing by defendant, Taylor had never seen him before. Taylor never heard gunshots fired.

¶ 9    Suddenly, a car pulled up behind the three women and two police officers exited. The officers ordered defendant and his companion not to move. Taylor then heard over the police radio that gunshots had been reported in the alley of 6535 or 6537 California. When the three women exited their car, Stennis and Walton walked into the courtyard while Taylor remained by the sidewalk. In addition, she did not see defendant throw a gun into the hallway. The police did, however, cuff defendant's hands behind his back. Furthermore, the police emptied defendant's pockets, which contained his wallet, his cell phone and keys. Moreover, Taylor heard over the radio that the police were looking for a man with dreadlocks and a white T-shirt. Defendant wore a white T-shirt but did not have dreadlocks. After more officers entered the courtyard, the police apparently entered the building. Walton argued with one officer who was preventing her from entering. The police then exited the building and announced that they were taking defendant with them.

¶ 10    Stennis testified that before the three women went out on the night in question, Walton said hello to defendant, her boyfriend. When they returned, they sat in Stennis' car for about

- 3 -

an hour while defendant sat outside. The women made eye contact with defendant but did not say hello. Defendant was playing a game on his iPod but she could not hear any music coming from it because he was too far away. Another man who was near defendant appeared to be singing or rapping. The three women never heard gunshots.

¶ 11        After about an hour, a police car stopped behind Stennis' car. An officer, apparently Officer McDevitt, proceeded into the courtyard and ordered defendant, who was sitting in a chair, not to move. Officer McDevitt's gun was not drawn and Stennis never saw defendant approach the door. In addition, Stennis and Walton walked into the courtyard while Taylor remained by the sidewalk. Defendant was then handcuffed to the other man and searched. Stennis never saw any pills on defendant's person. Meanwhile, Stennis heard over the police radio that gunshots had been fired in an alley and the police were looking for a man with a white T-shirt and dreadlocks. Police officers then entered the building. Over Walton's objection, they went inside her apartment. Walton and Stennis followed the officers inside, where they threw pillows off of Walton's couch. The officers returned outside empty handed, however. Both defendant and the other man were taken to the police station.

¶ 12        Defendant testified that on the night in question, he was visiting Walton. He described her as a "[f]riend, more like a girlfriend but more a friend." When he arrived, he spoke to her briefly but then she and her friends went to the store. When they returned, they acknowledged each other but did not say hello to one another. Defendant did not want to interrupt their "women's talk." During the 45 minutes that the women sat in the car, defendant played a game on an iPod. Another man, whose name defendant did not know, stood nearby and rapped. Defendant also talked to the man. Furthermore, defendant did not hear shots fired.

¶ 13        When the police arrived, they told defendant not to move and he complied. He never threw a gun into the hallway and Officer McDevitt found no contraband while searching him. His pockets did contain, however, Walton's apartment key. In addition, defendant could hear over the radio that the police were looking for a black man with dreadlocks and a white T-shirt, and that the man was still standing on the back porch of a building with a gun. After defendant was arrested, he learned that he was being charged with possessing a firearm and that controlled substances were allegedly found. Walton visited him in jail and kept contact with him through the mail but defendant had not spoken to Stennis or Taylor since his arrest.

¶ 14        Officer Elliot Flagg testified in rebuttal that on the night in question, he responded to a call of shots fired in the 6500 block of South California Avenue. There had been multiple calls, some of which were directed toward South California Avenue. Officer Flagg found no one in the alley but subsequently observed Officer May, Officer McDevitt, their partner, defendant and another black man in the courtyard at 6527 South California Avenue. Defendant was already handcuffed at this time. At no time did Officer Flagg see women near the courtyard. Additionally, he never heard a radio transmission describing a man with a white T-shirt and dreadlocks who was alleged to be standing in any particular location. Furthermore, Officer Flagg did not see the police recover anything from the building and did not see a handgun.

¶ 15        Following trial, the court found the police went to the area based on calls of shots fired and saw defendant standing in the courtyard. The court also found the police saw that defendant quickly walked toward the door, "reached in his waist, and threw a shiny object into the hallway." Defendant was detained and a firearm was retrieved. In addition,

controlled substances were recovered from defendant's person. Furthermore, the court found defendant was a convicted felon based on his prior convictions of "aggravated domestic battery" and first degree murder. Accordingly, the court found defendant guilty of being an armed habitual criminal, two counts of armed violence, unlawful possession of a weapon by a felon, and two counts of unlawful possession of a controlled substance.

¶ 16 Defense counsel subsequently challenged the sufficiency of the evidence to sustain defendant's conviction for being an armed habitual criminal. Specifically, counsel argued that defendant did not have a prior conviction for aggravated domestic battery; rather, his prior conviction was for domestic battery. Counsel argued that this did not qualify as a prior conviction necessary to support a requisite element of being an armed habitual criminal. The trial court disagreed. After finding that several counts merged, the court sentenced defendant to three concurrent 18-year prison terms for the armed habitual criminal count and the two armed violence counts. The court subsequently denied defendant's motion to reconsider his sentence.

¶ 17                                              II. ANALYSIS
¶ 18                                    A. Credibility of the Evidence
¶ 19 On appeal, defendant first asserts the evidence was insufficient to sustain his convictions because Officer McDevitt's uncorroborated testimony that he saw defendant with a firearm and controlled substances was contrary to human experience. In reviewing the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the State proved the essential elements of the crime beyond a reasonable doubt. *People v. Belknap*, 2014 IL 117094, ¶ 67. The trial court is entitled to determine the weight to be given to the witness's testimony, to draw reasonable inferences from the evidence and to resolve conflicts in the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). In addition, the trial court may accept or reject as much of a witness's testimony as it pleases. *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67. Furthermore, the existence of conflicting evidence does not itself require a reviewing court to reverse a defendant's conviction. *Id*. While a conviction must be set aside where it is based on testimony that is unconvincing, improbable and contrary to human experience (*People v. Appelt*, 2013 IL App (4th) 120394, ¶ 65), we may not substitute the trial court's judgment with our own (*Sutherland*, 223 Ill. 2d at 242).

¶ 20 In this case, defendant was convicted of being an armed habitual criminal and committing armed violence. The statute for the former offense provides that "[a] person commits the offense of being an armed habitual criminal if he or she receives, sells, possesses, or transfers any firearm after having been convicted a total of 2 or more times" of certain offenses, which we will later address in more detail. 720 ILCS 5/24-1.7(a) (West 2012). In addition, "[a] person commits armed violence when, while armed with a dangerous weapon, he commits any felony defined by Illinois Law," with certain exceptions not applicable here. 720 ILCS 5/33A-2(a) (West 2012); see also *People v. Anderson*, 364 Ill. App. 3d 528, 539 (2006) (the moment of arrest does not determine whether a defendant is armed). In this case, the armed habitual criminal and armed violence charges required that defendant possess a handgun. Furthermore, the felonies underlying defendant's armed violence convictions were based on his possession of controlled substances. Defendant asserts, however, that the State failed to

prove that he had a firearm or controlled substances because Officer McDevitt's testimony was incredible.

¶ 21 The trial court unequivocally found that the object defendant threw in the doorway proved to be a handgun. *Cf. People v. Warren*, 40 Ill. App. 3d 1008, 1011 (1976) (finding that the defendant's conviction could not stand where the trial court expressed continuous doubts as to the defendant's guilt and the credibility of the State's witness). Specifically, the court found that Officer McDevitt saw defendant throw a "shiny object" into the hallway and that a firearm was subsequently recovered. The officer's testimony supports such a finding. In addition, Officer McDevitt testified that a patdown of defendant revealed controlled substances. No portion of the officer's testimony was so incredible as to require the trial court to disregard the entirety of the officer's testimony.

¶ 22 Defendant contends it is inconceivable that defendant, having seen an officer, would have tossed out a handgun and then returned to the courtyard. As a convicted felon, however, defendant had every reason not to be caught in possession of a handgun. Additionally, gunshots had just been fired in the area, notwithstanding defendant's testimony that he did not hear them. Defendant may very well have wished to avoid police suspecting that he was the individual responsible. Furthermore, defendant may have believed himself to be more discrete in removing the handgun than he actually was and may have returned outside to avoid the appearance of attempting to evade the officers. Moreover, while defendant testified that he had the key to Walton's apartment, the trial court was not required to find that testimony to be credible. Thus, defendant may have returned outside because he could get no further than the hallway.

¶ 23 Contrary to defendant's suggestion, it is also not hard to imagine that police would patrol the immediate area where a shooting was reported, not only the exact address. Although the record supports defendant's assertion that Officer McDevitt did not initially see defendant or his companion committing any crime, defendant ignores that the officer could have initially approached defendant for more information. Defendant further ignores Officer McDevitt's testimony that defendant discarded something from his pants while the officer approached. Moreover, the absence of fingerprint evidence does not change the result, particularly given that the officer witnessed defendant's possession of contraband firsthand and, thus, knew his identity.

¶ 24 We also note trial counsel's argument that a police officer who saw a gun in defendant's hand would have done more than simply tell him to stop, whether that further action be alerting his partners to the presence of a gun or invoking a greater show of force. We too find it surprising that an officer, who was entirely certain upon first sight that the object was a firearm, would not have taken some further action. With that said, it appears that the trial court may not have believed Officer McDevitt possessed the level of certainty that he proclaimed to have at the beginning of the encounter. Specifically, the court found only that Officer McDevitt saw defendant retrieve a "shiny object" from his waistband. Nonetheless, the trial court was entitled to find that the object proved to be a handgun given testimony that no other objects were in the hallway where defendant threw the object, and notwithstanding any skepticism as to when exactly Officer McDevitt knew the object was a gun. We reiterate that the trial court is entitled to accept as much or as little of a witness's testimony as it pleases.

¶ 25    Furthermore, the trial court was entitled to find that defendant's witnesses were not credible. Aside from defendant's self-interest, Stennis and Taylor too had potential biases as friends of defendant's paramour. In addition, the defense witnesses' testimony was riddled with inconsistencies. Taylor could hear defendant's music, but Stennis could not. Defendant testified that he was not listening to music; rather, he was playing a game. In addition, defendant's hands were either cuffed behind his back, or defendant was handcuffed to his companion. Furthermore, Taylor testified that the police were preventing Walton from entering the building but Stennis testified that both she and Walton followed the police inside. Stennis alone testified that defendant's companion was taken to the police station with defendant. Moreover, although Officer Flagg arrived only after defendant was arrested, he did not see any women there. Defendant disregards that if Stennis is to be believed, the three women were still present at that time. Finally, the trial court was not required to believe the defense witnesses' testimony regarding the radio dispatches, the absence of controlled substances or the absence of weapons.

¶ 26    We are unpersuaded by defendant's reliance on *People v. Tomasello*, 166 Ill. App. 3d 684 (1988). There, no evidence whatsoever rebutted or impeached the defendant's testimony that he had relinquished the key to his former residence, where cannabis was subsequently found. *Id.* at 690-91. Accordingly, the trier of fact could not reject that testimony. *Id.* Unlike *Tomasello*, however, here, the State provided evidence that contradicted the defense witnesses' testimony that defendant had no controlled substances or firearm, namely Officer McDevitt's testimony. Defendant's characterization of the defense witnesses' testimony as unrebutted is entirely disingenuous. Accordingly, we are unpersuaded by defendant's contention.

¶ 27                      B. Armed Habitual Criminal: Qualifying Offenses

¶ 28    Next, defendant asserts his prior domestic battery conviction does not constitute a prior offense necessary to be convicted as an armed habitual criminal. Section 24-1.7(a) states, in pertinent part, as follows:

> "A person commits the offense of being an armed habitual criminal if he or she receives, sells, possesses, or transfers any firearm after having been convicted a total of 2 or more times of any combination of the following offenses:
>
> > (1) a forcible felony as defined in Section 2-8 of this Code[.]" 720 ILCS 5/24-1.7(a) (West 2012).

Thus, qualifying convictions are elements of the offense. *People v. Davis*, 405 Ill. App. 3d 585, 591 (2010). In addition, one of the two convictions offered in support of defendant's armed habitual criminal conviction was domestic battery. Because domestic battery is not expressly enumerated in subsection (2) or (3) of the armed habitual criminal statute, it must constitute a forcible felony under subsection (1) in order to be a qualifying felony under the statute. For the following reasons, we find that defendant's prior domestic battery conviction does not qualify as a forcible felony.

¶ 29                            1. Forcible Felony Residual Clause

¶ 30    Section 2-8 of the Criminal Code of 2012 (Code) provides that a " '[f]orcible felony' means treason, first degree murder, second degree murder, predatory criminal sexual assault

of a child, aggravated criminal sexual assault, criminal sexual assault, robbery, burglary, residential burglary, aggravated arson, arson, aggravated kidnaping, kidnaping, aggravated battery resulting in great bodily harm or permanent disability or disfigurement and *any other felony which involves the use or threat of physical force or violence against any individual*." (Emphasis added.) 720 ILCS 5/2-8 (West 2012). Because domestic battery is not enumerated in this statute either, it must fall within the section 2-8 residual clause in order to satisfy the forcible felony statute and in turn, the armed habitual criminal statute. Pursuant to the section 2-8 residual clause, an offense constitutes a forcible felony where the defendant contemplates that force or violence against an individual might be involved and the defendant has implied he was willing to use force or violence against an individual. *People v. Belk*, 203 Ill. 2d 187, 195-96 (2003). Furthermore, an offense does not constitute a forcible felony merely because the defendant knows that his actions *might* involve the threat or use of force or violence. See *People v. Schmidt*, 392 Ill. App. 3d 689, 698 (2009). Accordingly, we must determine whether the legislature intended that the residual clause of section 2-8 could encompass domestic battery. We review this matter *de novo*. *Schlosser v. State*, 2012 IL App (3d) 110115, ¶ 22.

¶ 31    In interpreting a statute, our primary goal is to give effect to the legislature's intent. *Schmidt*, 392 Ill. App. 3d at 695. Such intent is best ascertained by examining the statute's language. *Id*. In addition, we must read a statute as a whole, considering all relevant provisions together. *People v. Moody*, 2015 IL App (1st) 130071, ¶ 50. Where a statute lists items to which it refers, an inference exists that all omissions must be understood as exclusions. *People v. Douglas*, 381 Ill. App. 3d 1067, 1074 (2008). Furthermore, we presume that the legislature did not intend inconvenient, absurd or unjust results. *Moody*, 2015 IL App (1st) 130071, ¶ 50.

¶ 32    We find *People v. Carmichael*, 343 Ill. App. 3d 855 (2003) to be instructive in determining whether an offense constitutes a forcible felony under the section 2-8 residual clause. There, the reviewing court considered whether a prior offense of armed violence (720 ILCS 5/33A-2 (West 2000)) constituted a forcible felony. *Carmichael*, 343 Ill. App. 3d at 859-60. The court essentially agreed with the defendant's observation that despite the offense's name, not all forms of armed violence involved the use or threat of physical force or violence. *Id*. Specifically, armed violence could occur where a defendant was armed with a dangerous weapon while possessing a controlled substance and, thus, was not an inherently violent felony. *Id*. at 859-61 (citing 720 ILCS 5/33A-2 (West 2000)); *cf. People v. Polk*, 2014 IL App (1st) 122017, ¶¶ 53-54 (finding that conspiracy to commit murder, one of the offenses enumerated in section 2-8, was inherently a forcible felony). In addition, the court acknowledged the State's contention that violence might accompany the aforementioned form of the offense in a particular case and, thus, constitute a forcible felony under section 2-8. *Carmichael*, 343 Ill. App. 3d at 860. The record was silent, however, as to the circumstances regarding the defendant's prior armed violence conviction. *Id*. at 861. Thus, the record did not show that defendant's prior armed violence conviction constituted a forcible felony. *Id*.

¶ 33    Pursuant to *Carmichael*, either the record must show that the specific circumstances of defendant's domestic battery conviction fall under the residual clause or domestic battery must inherently be a forcible felony under the residual clause. The State presented no evidence at trial concerning the circumstances surrounding defendant's prior conviction.

Accordingly, we consider whether domestic battery is inherently forcible.

¶ 34                                     2. Domestic Battery Statute

¶ 35        Section 12-3.2(a) states as follows:

> "A person commits domestic battery if he or she knowingly without legal justification by any means:
>
>> (1) Causes bodily harm to any family or household member;
>>
>> (2) Makes physical contact of an insulting or provoking nature with any family or household member." 720 ILCS 5/12-3.2(a) (West 2012).

In addition, domestic battery is generally a Class A misdemeanor but becomes a Class 4 felony if the defendant has a prior conviction for certain offenses, including domestic battery. 720 ILCS 5/12-3.2(b) (West 2012).[1]

¶ 36        We agree with defendant's contention that section 12-3.2(a)(2) based on contact of a provoking or insulting nature does not involve the use or threat of physical force or violence required to be a forcible felony under the residual clause. With that said, the record shows that defendant's domestic battery conviction fell under section 12-3.2(a)(1), which does require bodily harm. In addition, knowingly causing "bodily harm" pursuant to that subsection would seem to constitute physical force against an individual. Thus, at first blush, domestic battery under section 12-3.2(a)(1) would appear to constitute a forcible felony when reading the section 2-8 residual clause in isolation from the remainder of section 2-8.

¶ 37        It is well settled, however, that we must consider a statute in its entirety. *People v. Giraud*, 2012 IL 113116, ¶ 6. When considering section 2-8 as a whole, it becomes apparent that finding domestic battery to inherently constitute a forcible felony would lead to an absurd result. This is because section 2-8 contemplates that only aggravated battery based on *great* bodily harm or the like constitutes a forcible felony.

¶ 38                                     3. Enumerated Forcible Felonies

¶ 39        Prior to 1990, section 2-8 included all forms of aggravated battery in the enumerated list of forcible felonies. See *In re Rodney S.*, 402 Ill. App. 3d 272, 287 (2010). Now, however, section 2-8 enumerates only "aggravated battery resulting in great bodily harm or permanent disability or disfigurement." 720 ILCS 5/2-8 (West 2012). While several categories of aggravated battery include as elements great bodily harm, permanent disability or disfigurement, not all do. 720 ILCS 5/12-3.05 (West 2012). For example, section 12-3.05(c) provides, in pertinent part, that a "person commits aggravated battery when, *in committing a [simple] battery*, other than by the discharge of a firearm, he or she is or the person battered is on or about a public way." (Emphasis added.) 720 ILCS 5/12-3.05(c) (West 2012). Similar to domestic battery, the statute for simple battery provides that "[a] person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an

---

[1]We categorically reject defendant's assertion that his prior domestic battery conviction was a misdemeanor which was only enhanced to a felony for sentencing purposes as a result of an earlier domestic battery conviction. We adhere to this court's recent determination that where a defendant had committed his second offense of domestic battery, "he could not be charged with or convicted of anything less than the felony." *People v. Sumler*, 2015 IL App (1st) 123381, ¶ 45.

individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a) (West 2012). Accordingly, in defining forcible felonies, the legislature has specified aggravated battery based on great bodily harm, permanent disability or disfigurement, to the exclusion of aggravated battery where mere "bodily harm" has occurred.

¶ 40    As a result of the 1990 amendment, a split of authority emerged as to whether the section 2-8 residual clause can include aggravated battery that involves mere bodily harm. See *In re Rodney S.*, 402 Ill. App. 3d at 286-87 (4th Dist.) (finding that the definition of forcible felony does not include aggravated battery based only on bodily harm); *In re Angelique E.*, 389 Ill. App. 3d 430, 433-34 (2d Dist. 2009) (same); *Schmidt*, 392 Ill. App. 3d at 696 (1st Dist.) (finding that the legislature intended to limit the types of aggravated batteries that would constitute forcible felonies); but see *People v. Hall*, 291 Ill. App. 3d 411, 417-18 (1st Dist. 1997) (rejecting the defendant's contention that aggravated battery was not a forcible felony absent great bodily harm, permanent disability or disfigurement); see also *People v. Jones*, 226 Ill. App. 3d 1054, 1056 (3d Dist. 1992) (finding that the legislature intended forcible felonies to include "any aggravated battery that involved the use of physical force or violence against an individual"). More specifically, some decisions have determined that the legislature did not intend forcible felonies to include aggravated battery that was merely simple battery committed on a public way, having already enumerated another form of aggravated battery. See *In re Angelique*, 389 Ill. App. 3d at 433-34; *People v. Rodriguez*, 258 Ill. App. 3d 579, 585 (1st Dist. 1994); *People v. Leahy*, 229 Ill. App. 3d 1070, 1075 (2d Dist. 1992). Given the legislature's decision to add language limiting the enumerated form of aggravated battery to instances involving great bodily harm, permanent disability or disfigurement, we agree with reviewing courts that have found the legislature deliberately excluded aggravated battery based on mere bodily harm from the definition of forcible felonies.

¶ 41    In light of that determination, we also find the legislature did not intend for domestic battery to inherently fall under the section 2-8 residual clause, which would create a result that is both unfair and absurd. If causing mere bodily harm for purposes of aggravated battery does not constitute a forcible felony, it would be disparate to find that mere bodily harm under the domestic battery offense does. One offense is no more forcible than the other. Although orders entered by this court under Illinois Supreme Court Rule 23(b), (e) (eff. July 1, 2011) are "not precedential and may not be cited by any *party*" (emphasis added), we note that another district of this court has reached the same conclusion. See *People v. White*, 2014 IL App (4th) 120785-U, ¶ 31. In addition, a separate statute exists for aggravated domestic battery based on great bodily harm, permanent disability or disfiguration. 720 ILCS 5/12-3.3(a) (West 2012). The elevated harm required by that statute is far more consistent with the spirit of the forcible felony statute. We further note that in the Firearm Owners Identification Card Act, our legislature has referred to the seizure of a firearm owners identification card based on the separately enumerated bases of "a forcible felony" or "domestic battery." 430 ILCS 65/10(a) (West 2012). This further supports our determination that the legislature did not intend for one to be a form of the other.

¶ 42    We join our colleagues in urging the legislature to clarify this statute. See *Schmidt*, 392 Ill. App. 3d at 696. Meanwhile, it cannot be said that defendant's domestic battery conviction constituted a forcible felony. In turn, that conviction did not satisfy an element of the armed

- 10 -

habitual criminal offense and defendant's conviction for that offense must be vacated.

¶ 43                          C. Multiple Armed Violence Convictions

¶ 44        Next, defendant contends that we must vacate one of his convictions for armed violence based on the one-act, one-crime doctrine. Defendant also contends that had the legislature intended for a defendant to be convicted of multiple counts of armed violence based on the commission of multiple predicate felonies, the legislature would have clearly indicated as such. Defendant somewhat conflates one-act, one-crime principles and principles of statutory construction. See *People v. Carter*, 213 Ill. 2d 295, 300 (2004) (superseded by statute). One-act, one-crime principles apply only if the statute permits multiple convictions for simultaneous predicate felonies based on differing controlled substances. See *People v. Almond*, 2015 IL 113817, ¶ 33; *Carter*, 213 Ill. 2d at 300-01. Consequently, we begin by determining whether the armed violence statute authorizes separate offenses to be charged based on simultaneous predicate felonies. We review this issue of statutory construction *de novo*. *Carter*, 213 Ill. 2d at 301.

¶ 45        Section 33A-2(a) of the Code states that "[a] person commits armed violence when, while armed with a dangerous weapon, he commits *any felony* defined by Illinois Law" except certain enumerated felonies not at issue. (Emphasis added.) 720 ILCS 5/33A-2(a) (West 2012). Here, defendant was found guilty of two counts of armed violence. One count charged that defendant, while armed with a handgun, committed the felony of possession of a controlled substance: 5-Methoxy-N, N-Diisopropyltryptamine. See 720 ILCS 570/402(c) (West 2012) (possession of a controlled substance). The other count for which defendant was found guilty charged that defendant, while armed with a handgun, committed the felony of possession of a controlled substance: N-Benzylpiperazine. Thus, the two underlying felonies were based on possessing different substances.

¶ 46        We note that the possession of a controlled substance statute permits multiple convictions for the simultaneous possession of multiple substances. *Carter*, 213 Ill. 2d at 301, 303. Thus, the record here would have supported two convictions for possession of a controlled substance based on two different substances. The question before us, however, is whether the armed violence statute's language, requiring that the defendant commit "any felony," permits multiple convictions for the simultaneous commission of two different felonies.

¶ 47        In *Carter*, our supreme court observed that the term "any" can be singular or plural. *Id*. at 301-02. As a result, the court determined that the statute for unlawful use of weapons by a felon (UUWF), which stated that it was unlawful for a felon to possess "any firearm or any firearm ammunition" (720 ILCS 5/24-1.1 (West 1996)), was ambiguous because it did not adequately define the allowable unit of prosecution. *Carter*, 213 Ill. 2d at 302. Furthermore, ambiguous criminal statutes must be construed in favor of the accused. *Id*. Accordingly, the court found that the simultaneous possession of multiple firearms or ammunition constituted only one offense. *Id*. at 306. Following *Carter*, the legislature amended the UUWF statute to state that "[t]he possession of each firearm or firearm ammunition in violation of this Section constitutes a single and separate violation." 720 ILCS 5/24-1.1(e) (West 2008).

¶ 48        Similar to the pre-amendment UUWF statute, section 33A-2 provides that armed violence occurs where an armed person commits "any" felony. 720 ILCS 5/33A-2 (West 2012). It is unclear whether the legislature intended for *any* felony to be singular or plural. Accordingly, the statute is ambiguous as to whether the commission of each underlying felony supports a

separate armed violence conviction. We further note that the armed violence statute contains no provision similar to the post-*Carter* UUWF amendment specifying that the commission of each felony constitutes a single and separate armed violence offense. See *id*. Accordingly, we must construe this ambiguity in defendant's favor and hold that the statute does not authorize multiple armed violence convictions for multiple, simultaneous, underlying felonies. In light of our determination, we need not consider whether two convictions would have violated the one-act, one-crime doctrine.

¶ 49　　We must now determine what relief is appropriate. Before sentencing defendant, the trial court determined that the possession of 5-Methoxy-N, N-Diisopropyltryptamine count merged into the armed violence count based on the same predicate possession felony, and the possession of N-Benzylpiperazine count merged into the armed violence count based on that predicate possession felony. Defendant asserts that the appropriate remedy would be to vacate one armed violence conviction and remand for resentencing on an underlying possession of a controlled substance offense. The State has not specified what relief is appropriate should we agree with defendant's contention that two armed violence convictions cannot stand. Accordingly, we vacate defendant's armed violence conviction predicated on possession of N-Benzylpiperazine and remand for the trial court to impose a sentence for the possession count based on the same substance.

¶ 50　　　　　　　　　　　　　　　　D. Sentencing

¶ 51　　Finally, defendant contends that the trial court abused its discretion in sentencing defendant to 18 years in prison. On remand, the trial court will have the opportunity to consider whether 18 years remains an appropriate sentence for the remaining armed violence conviction. We need not consider this contention further.

¶ 52　　　　　　　　　　　　　　　III. CONCLUSION

¶ 53　　The trial court was entitled to find that Officer McDevitt observed an object which proved to be a firearm. In addition, defendant's prior domestic battery conviction does not constitute a forcible offense necessary to satisfy the armed habitual criminal offense. Furthermore, the armed violence statute does not clearly authorize the imposition of multiple convictions where two underlying felonies occurred simultaneously.

¶ 54　　For the foregoing reasons, we vacate defendant's armed habitual criminal conviction, vacate one armed violence conviction and remand for sentencing.

¶ 55　　Affirmed in part; vacated in part; cause remanded.