2021 IL App (1st) 182038-U

No. 1-18-2038

Order filed May 28, 2021

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 7525 |
| | ) | |
| ANNA DEROSE, | ) | Honorable |
| | ) | Joel L. Greenblatt, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Hoffman and Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for attempt first degree murder is affirmed because the evidence was sufficient to demonstrate that the defendant intended to kill.

¶ 2    After a bench trial, defendant Anna Derose[1] was found guilty but mentally ill of attempt first degree murder, aggravated assault with a motor vehicle, two counts of resisting or obstructing a peace officer, and criminal damage to property. The court merged the aggravated

_____

[1] In the record, defendant is referred to both as Anna Dugo and Anna DeRose. We adopt the name and spelling from her notice of appeal.

assault count into the attempt first degree murder count, and sentenced defendant to six years' imprisonment on that count and three years' concurrent imprisonment on each other count. On appeal, defendant argues only that the evidence was insufficient to establish her intent to kill. We affirm.

¶ 3    Defendant was charged by indictment with attempt first degree murder (720 ILCS 5/8-4(a) (West 2016); 720 ILCS 5/9-1(a)(1) (West 2016)), aggravated assault with a motor vehicle (720 ILCS 5/12-2(c)(7) (West Supp. 2015)), two counts of resisting or obstructing a peace officer (720 ILCS 5/31-1(a-7) (West 2016)), and criminal damage to property (720 ILCS 5/21-1(a)(1) (West 2014)). Before trial, defendant asserted an insanity defense.

¶ 4    At trial, Dominic Dugo testified that he married the defendant 1995 and that they have three children. They divorced in 2013, and Dugo received an order of protection against defendant which was continued through November 2016. After the divorce, Dugo and the children lived at the family's home on McWalter Drive in Roselle. Dugo described an incident in 2011 when defendant struck him and bloodied his nose, and an incident in 2015 when defendant violated the order of protection by ringing and knocking at the family's door. Recordings of 9-1-1 calls Dugo placed during those incidents were published and are in the record on appeal.

¶ 5    At approximately 7:30 p.m. on April 21, 2016, Dugo was home and answered a phone call from his son. His son stated that he had just arrived home, and defendant was in the driveway. Defendant spoke with him and kissed his hand. Dugo told his son to leave. It was light outside, and through a window, Dugo saw defendant's small black Ford SUV. He then saw defendant looking through a window into the house. Defendant saw Dugo, entered her vehicle, and drove away.

¶ 6    Dugo then received a phone call from Ann Marie Gutierrez Depinto,[2] whose home on Carey Drive shared a backyard with Dugo's. Defendant had entered Depinto's home seeking defendant's family, then sat in her vehicle in Depinto's driveway.

¶ 7    Dugo exited his home, and defendant drove to the end of his driveway. He approached defendant's vehicle and asked why she was there. Defendant "looked at [Dugo] with a deep look in her eye and pointed at [Dugo] and said, 'I'm here to kill you.' " Defendant reversed her vehicle, then drove forward, attempting to run over Dugo and chasing him up the driveway. Dugo ran around his Ford F350 pickup truck, and defendant crashed into the truck and moved it three feet.

¶ 8    Dugo called 9-1-1 and ran into the backyard. Defendant reversed, sped around the block, then drove between two homes on Carey, entered the open yard behind the homes, and drove at Dugo. Dugo ran towards McWalter, between the homes of Ashish Patel and Frank Griseta, and defendant chased him at 30 or 35 miles per hour. Dugo cut in front of Patel's home and behind a retaining wall and vehicle. Dugo then ran back to the backyard as defendant drove through Patel's front yard and hit the retaining wall. Then, she returned to the street and circled the block.

¶ 9    Dugo saw Depinto in the backyard and entered Depinto's home. Defendant drove into the backyard from Carey, then through a space next to Dugo's home and onto McWalter. A police vehicle arrived and chased defendant down Carey.

¶ 10    The State published footage from a camera on Griseta's home, which captured defendant chasing Dugo between Griseta's and Patel's homes. The video, which is included in the record on appeal, depicts the space between two homes. Dugo enters the frame from the top of the

_____

[2] Depinto's first name is spelled both Ann and Anne in the record, and her last name is spelled both Depinto and DePinto.

screen and runs down a sidewalk beside the home on the left. He exits the frame near the bottom left corner of the screen. A dark SUV then follows Dugo, moving much faster. Part of the vehicle is on the sidewalk. The vehicle's brake lights appear to activate as it leaves the bottom of the screen.

¶ 11    Dugo further testified that he had remained on the phone with the 9-1-1 operator throughout the incident. Dugo identified photographs of the neighborhood, which are in the record on appeal, including photographs showing the space between Patel's and Griseta's homes, and Patel's retaining wall. Dugo also marked his, Patel's, Griseta's, and Depinto's homes on an aerial photograph of the neighborhood, as well as his and defendant's paths during the incident.

¶ 12    On cross-examination, Dugo testified that, after defendant saw Dugo through a window and returned to her vehicle, he went upstairs to look through another window, and her vehicle was gone. After speaking with Depinto, Dugo went outside, and defendant arrived at the end of the driveway. Dugo agreed that defendant's vehicle was "[c]onsiderably" smaller than his truck.

¶ 13    Depinto testified that she and defendant were friends, and her backyard was located kitty-corner from Dugo's. At approximately 7:30 p.m. on April 21, 2016, Depinto opened the door to her mudroom and saw defendant in the doorway. Defendant repeatedly "demanded *** to know where her family was," then exited into the garage. Depinto followed to close the garage door, and saw defendant in the mudroom, "listening by the door." Defendant left.

¶ 14    Depinto called Dugo and stated that defendant sought her family, was very upset, and was "out to get" Dugo. Defendant's small black SUV had left, and after a while, began speeding around the block. Defendant then jumped the curb and drove past Depinto's home, into the backyard.

¶ 15    Depinto called the police and went to the rear of her home, where she saw defendant drive between Griseta's and Patel's houses. Dugo was running in the backyard, and entered Depinto's house at her urging. Depinto identified photographs of her home and backyard, drew lines following defendant's path into and through the backyard, and marked Patel's and Griseta's homes.

¶ 16    On cross-examination, Depinto testified that defendant did not mention Dugo, but asked where her family was and stated that she "had every right" to be in Depinto's house. Defendant did not indicate that she wished to harm anybody. Defendant circled the block several times before driving into the backyard. Depinto had not seen Dugo in the backyard yet. Defendant's vehicle went through the backyard a second time but Depinto did not remember when.

¶ 17    Patel testified that, at 7:30 p.m. on April 21, 2016, he saw a small black SUV drive between two houses into the backyard, approaching his home at approximately 25 miles per hour. The vehicle swerved and disappeared between his and Griseta's homes, driving towards McWalter. Patel called 9-1-1, and subsequently saw Dugo run through the backyard and enter Depinto's home.

¶ 18    Patel later saw tire tracks in his backyard, between his house and Griseta's, and on his driveway, and damage to his stone landscaping. On photographs of the area included in the record on appeal, Patel marked his and Griseta's homes, traced the path the vehicle traveled, circled tire tracks in the grass and on his driveway, and identified a sidewalk on the side of his home and displaced landscaping stones, with tire tracks, on a short retaining wall. On cross-examination, Patel testified that he saw Dugo run back and forth twice in the backyard, and then saw the vehicle approximately 25 feet from Dugo.

¶ 19    Griseta testified that around 7:30 p.m. on April 21, 2016, he heard arguing outside his home, looked into the backyard, and saw a small black SUV drive between two houses towards his house at about 35 miles per hour. He heard the vehicle drive between his and Patel's houses. He ran to the front of his home and saw the vehicle had turned onto Patel's driveway and apparently hit something. The vehicle reversed and left on McWalter. Griseta estimated his and Patel's homes were 30 or 40 feet apart, but closer in some areas due to his air conditioning units and Patel's garbage cans.

¶ 20    A surveillance camera on Griseta's home was angled to capture the space between his and Patel's homes, and recorded video of someone running through the gangway chased by a vehicle. Griseta identified the footage. On cross-examination, Griseta testified he never saw Dugo.

¶ 21    The State published recordings of the 9-1-1calls placed by Dugo, Depinto, Patel, and Griseta during the incident. They are included in the record on appeal, and generally track the witnesses' testimony. Dugo did not tell the dispatcher that defendant threatened to kill him.

¶ 22    Roselle police officer Diana Cantu testified that, around 7:30 p.m. on April 21, 2016, she was dispatched to a domestic disturbance at Dugo's home. When she arrived, a black SUV was stopped in front of the home. Cantu activated her lights and siren, but the vehicle turned onto Carey, and then Larson Lane, while Cantu followed. The vehicle attempted a U-turn at Jennifer Lane and Larson. Cantu exited her vehicle and approached the driver, whom she identified as defendant in court.

¶ 23    Cantu requested that the defendant open the door, but defendant responded that she "didn't do anything." Another police vehicle arrived and parked in front of defendant's vehicle,

which moved forward but then stopped. Officer Angela Genetski exited her vehicle, and Cantu and Genetski ordered defendant to exit. Defendant reversed, and Genetski broke the front passenger's window and unlocked the doors. Cantu pulled defendant from the vehicle and to the ground. The vehicle rolled backwards when defendant's foot left the brake, and the open driver's door struck Cantu's right knee. Defendant kicked, yelled that she did not do anything, and trapped her arms underneath herself. Genetski secured the vehicle, then assisted Cantu in handcuffing defendant. The officers forced defendant into a police vehicle.

¶ 24    Footage from Cantu's dashboard camera, which is in the record on appeal, was published and depicts the events Cantu described. Cantu's right knee was swollen and bruised for several months. She also received scratches on her arm and left knee when defendant resisted arrest. Cantu identified photographs of her injuries, which are in the record on appeal. On cross-examination, Cantu testified that she did not see Dugo or seek medical attention for her knee.

¶ 25    Genetski testified that, when she arrived at Jennifer and Larson, Cantu was outside her vehicle and near a black SUV. Genetski parked her vehicle in front of the black SUV, which had inched forward. Genetski approached the vehicle, and identified defendant as the driver in court. When defendant refused to exit the vehicle, Genetski returned to her vehicle and learned that there was an active warrant for defendant's arrest. When defendant reversed gear, Genetski broke defendant's window, unlocked the doors, and helped Cantu remove defendant. Defendant's vehicle rolled backwards, and Genetski hit her head on the vehicle when she "jumped" in to secure it. She then assisted Cantu in handcuffing defendant.

¶ 26    Defendant continued to resist as the officers put her in Genetski's vehicle. Defendant asked, "are you done yet?" and stated, "[t]his is f*** ridiculous." She yelled, "I'm not getting in

the car." As Genetski buckled her in, defendant said, "undo the buckle and you get to keep your jobs." Defendant screamed, lifted her feet, and kicked the plexiglass. She said, "I had permission to do that," and "I had permission to go on that lawn."

¶ 27    Defendant freed one of her hands, and Cantu and another officer who had arrived assisted Genetski in handcuffing her more securely. Defendant screamed, Genetski advised her of her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and defendant then became silent.

¶ 28    Genetski's dash camera footage, which is in the record on appeal, was published and depicts the events she described, including defendant's substantially identical statements. In the video, when officers remove defendant from the vehicle at the police station, defendant tells them not to treat her like a "criminal."

¶ 29    Genetski stated that her head hurt where she bumped it and, while handcuffing defendant, she sustained scrapes and bruises on her legs and arms. Genetski identified photographs of the injuries to her arm and leg which are in the record on appeal.

¶ 30    On cross-examination, Genetski testified that she never sought medical attention and acknowledged her report did not state that she sustained bruises or scratches on her arms or that Cantu sustained any injuries besides her knee. Genetski spoke with Dugo at the police station, but did not recall if Dugo relayed that he thought defendant would kill him.

¶ 31    The defense called Dr. Linda Gruenberg, a psychiatrist, who testified that defense counsel retained her to evaluate whether defendant was fit for trial and sane on April 21, 2016. Dr. Gruenberg interviewed defendant on May 4, 2017 and June 19, 2017. She considered employment records showing defendant was terminated from her job several days before the instant offense, and medical records which detailed her prior hospitalizations, delusional and

paranoid thinking, postpartum depression, schizoaffective disorder, and medications for mental illness. She also interviewed defendant's family members and a doctor at the Cook County jail. Additionally, Dr. Gruenberg considered a report by a psychologist, Dr. Eric Ostrof,[3] which concluded defendant lacked substantial capacity to appreciate the criminality of her conduct. Dr. Gruenberg reviewed the police reports, 9-1-1 recordings, and video of defendant's arrest, but did not see video of Dugo running between the houses until shortly before trial.

¶ 32    Through her conversations with defendant and review of the other materials, Dr. Gruenberg learned that, at various times, defendant believed that Dugo was molesting their daughter, harming their children, or trying to kill defendant. Dr. Ostrof's report indicated that defendant's delusional beliefs about Dugo caused her actions in the instant case. Two weeks prior to the offense, defendant broke up with her then-boyfriend and had delusions that he and Dugo sought to harm her.

¶ 33    Defendant reported that, on April 21, 2016, something was "pushing or pulling her" to go to Dugo's home and see her children. Defendant began to drive away after kissing her son's hand, but hit the truck and experienced shortness of breath, a racing heart, and blurry vision, symptoms of a panic attack. Defendant was also psychotic and delusional, which Dr. Gruenberg believed impacted her ability to appreciate her actions. Defendant reported asking for help as she drove through the grass without knowing where she headed. She stated she was not there to harm Dugo. Defendant feared the police would take her vehicle, and was hospitalized and given psychotropic medication following her arrest.

---

[3] Dr. Ostrof's name is spelled both Ostroff and Ostrof in the record.

¶ 34    Dr. Gruenberg determined that defendant was fit for trial with medication, but was legally insane on April 21, 2016, and lacked the substantial capacity to appreciate the criminality of her conduct. Dr. Gruenberg diagnosed defendant with schizoaffective disorder, bipolar type. On cross-examination, Dr. Gruenberg testified that the video from Griseta's camera was not available when she evaluated defendant, and that the video did not change her opinion.

¶ 35    Dr. Erick Neu, a staff psychologist with the Forensic Clinical Services division of the Circuit Court of Cook County, testified that he evaluated defendant and met with her on October 10, 2017 and October 30, 2017. Defendant exhibited residual delusional beliefs that, at the time of the offense, her ex-boyfriend was trying to kill her and Dugo sexually abused their children. Defendant stated she had a panic attack when she saw Dugo on April 21, 2016, drove on the grass because her vision was blurry, and accidentally backed into Dugo's truck. Dr. Neu determined she experienced a psychotic episode during the events. Dr. Neu also considered police reports, Dr. Gruenberg's and Dr. Ostrof's reports, footage, medical records, and other documents. Dr. Neu diagnosed defendant with schizoaffective disorder of the bipolar type and determined that she was legally insane on April 21, 2016.

¶ 36    Following closing arguments, the court found that defendant had not proved she was insane at the time of her offenses. The court found defendant guilty but mentally ill on all counts. The court denied defendant's amended motion for new trial or to modify judgment.

¶ 37    Following a hearing, the court merged the aggravated assault count into the attempt first degree murder count, and sentenced defendant to six years' imprisonment thereon, with three years' concurrent imprisonment on each other count. Defendant did not file a postsentencing motion.

¶ 38    On appeal, defendant argues that the State failed to prove her guilty of attempt first degree murder beyond a reasonable doubt because the surveillance video, her statements, and her reckless driving did not establish her intent to kill Dugo. Accordingly, defendant requests we reduce her conviction to aggravated assault.

¶ 39    When considering the sufficiency of the evidence, we determine whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. *People v. Newton*, 2018 IL 122958, ¶ 24. The reviewing court will not retry the defendant, and will draw all reasonable inferences in favor of the State. *Id.* Moreover, the reviewing court will not substitute its judgment for the trier of fact's on issues involving the weight of the evidence or the witnesses' credibility. *People v. Hardman*, 2017 IL 121453, ¶ 37. The testimony of a single credible witness may sustain a conviction. *People v. Swenson*, 2020 IL 124688, ¶ 36. The trier of fact need not equate all possible explanations consistent with innocence with a reasonable doubt of guilt. *Newton*, 2018 IL 122958, ¶ 24. A conviction will not be reversed unless the evidence is so unreasonable, improbable, or unsatisfactory that it raises a reasonable doubt of the defendant's guilt. *Id.*

¶ 40    To prove defendant's guilt of attempt first degree murder, the State was required to show "that the defendant performed an act that constituted a substantial step toward the commission of first degree murder and that the defendant did so with the specific intent to kill the victim." *People v. Reynolds*, 2021 IL App (1st) 181227, ¶ 34; see also 720 ILCS 5/8-4(a) (West 2016); 720 ILCS 5/9-1(a) (West 2016). A defendant's intent is rarely shown by direct evidence, and may be inferred from surrounding circumstances such as the character of the attack or the use of a deadly weapon. *Reynolds*, 2021 IL App (1st) 181227, ¶ 34. People are presumed to intend the

"natural and probable consequences" that flow from their deliberate acts. (Internal quotation marks omitted.) *People v. Smith*, 402 Ill. App. 3d 538, 547 (2010). A vehicle may be used as a deadly weapon. *People v. Schmidt*, 392 Ill. App. 3d 689, 704 (2009).

¶ 41    At trial, the evidence showed that defendant saw Dugo in his home and drove away. She then visited Depinto's home and demanded to see her family. After a phone call with Depinto, Dugo exited his home, and defendant returned to his driveway. When Dugo asked why she was there, defendant said, "I'm here to kill you." She then reversed her vehicle and drove forward at Dugo, who dodged around his truck. Defendant struck the truck, moving it three feet. Dugo ran into the backyard and defendant chased him before he entered Depinto's home. Video footage shows Dugo fleeing defendant's vehicle between Patel's and Griseta's homes.

¶ 42    We conclude that a rational trier of fact could find that defendant acted with the intent to kill Dugo. Had Dugo not dodged around his truck and fled, the natural consequence of defendant's driving straight at him would have been to harm or kill him. This is particularly so where defendant struck Dugo's truck hard enough to move it, and as depicted in the footage, chased him between the houses while driving faster than he ran. See *Smith*, 402 Ill. App. 3d at 547 (finding sufficient evidence to sustain conviction for attempt murder of a peace officer where defendant looked at officer for 15 seconds, then drove at him on sidewalk, and the "natural consequence" would have been to harm or kill had officer not dived away).

¶ 43    Defendant argues that the video from Griseta's surveillance camera establishes that she did not intend to kill Dugo because her vehicle's brake lights activated as she drove between the homes. By slowing, defendant contends, she gave up an opportunity to kill Dugo. Then, defendant posits, because she could have killed Dugo, her statement that she would kill him does

not establish her intent. Further, defendant argues that her statements to Depinto and conversation with her son indicated she was there to see her children, not harm Dugo. Defendant also notes that Dugo did not tell the 9-1-1 dispatcher that defendant threatened him.

¶ 44    We note again that it is not our function to retry defendant (*Newton*, 2018 IL 122958, ¶ 24), raise possible explanations of innocence to the level of reasonable doubt (*id.*), or substitute our judgment for the trial court's on issues involving the weight of the evidence or the witnesses' credibility (*Hardman*, 2017 IL 121453, ¶ 37). Therefore, given the facts discussed above, which support defendant's intent to kill, we will not reduce defendant's conviction because some of her conduct may have indicated she wished to see her children, Dugo did not tell the 9-1-1 dispatcher that defendant threatened to kill him, or she activated her brakes while driving between Griseta's and Patel's houses.

¶ 45    Further, the video from Griseta's camera does not establish that defendant lacked the intent to kill Dugo. In the video, Dugo exits near the bottom corner of the screen, near Patel's house, before defendant's vehicle appears, and her brake lights activate as she exits the bottom of the screen. Dugo testified that he turned and ran into Patel's driveway and around a vehicle to shelter himself from defendant, who struck Patel's retaining wall. Photographs show Patel's landscaping and retaining wall, which protrude into the area between Patel's and Griseta's homes, leaving only a narrow gap for defendant's vehicle to navigate, and the damage to Patel's retaining wall.

¶ 46    Defendant argues that we may draw our own conclusions about her speed in the video. See *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453 (2009) (applying *de novo* review where "the trial court heard no live testimony" and "was in no superior position than any reviewing

court to make findings"). Initially, we note that Dugo, Patel, and Griseta all testified that defendant drove between 25 and 35 miles per hour. Thus, live testimony also played a role in resolving the issue, and we must defer to the trial court's resolution. See *People v. Span*, 2011 IL App (1st) 083037, ¶ 27 ("Where, as here, live testimony had a role in resolving a disputed issue of fact, the rule in *Addison Insurance Co.* does not apply."). Further, the video depicts defendant driving much faster than Dugo is running. The video therefore does not establish that defendant slowed to avoid hitting Dugo.

¶ 47 Moreover, the events depicted in the video are not the only facts from which a rational trier of fact could find that defendant took a substantial step towards murdering Dugo with the specific intent to do so. Dugo testified that, before defendant chased him through the yards, he exited his home, defendant pointed at him and said she was there to kill him, reversed her vehicle, and drove it at him. Dugo dodged around his truck, which she struck with enough force to move it approximately three feet. See *Smith*, 402 Ill. App. 3d at 547.

¶ 48 Defendant compares her case to *People v. Garrett*, 216 Ill. App. 3d 348 (1991); *People v. Jones*, 184 Ill. App. 3d 412 (1989); and *People v. Thomas*, 127 Ill. App. 2d 444 (1970). Those cases are distinguishable in that, although the defendants beat and threatened to kill the victims, they did not kill the victims despite having sufficient opportunity and deadly weapons. See *Garrett*, 216 Ill. App. 3d at 350-51, 353-54 (defendant and accomplices held knife to victim's throat, threatened to kill victim, and beat him, but did not use knife); *Jones*, 184 Ill. App. 3d at 430-31 (defendants threatened to kill victim and victim's family, and beat victim with firearm but did not shoot victim or use knife defendants possessed); *Thomas*, 127 Ill. App. 2d at 447, 455-56 (defendant threatened to kill victim, hit her head against furniture, sexually assaulted her,

and injured her face and shoulder with knife). As discussed above, the surveillance video does not establish that defendant had the opportunity to kill Dugo and elected not to. Rather, a rational trier of fact could conclude that by driving her vehicle at Dugo, defendant used a deadly weapon in an attempt to kill him. See *Schmidt* 392 Ill. App. 3d at 704 (vehicle may be used as deadly weapon); see also *People v. Viramontes*, 2017 IL App (1st) 142085, ¶¶ 61-66 (distinguishing *Garrett* and *Jones* where defendant used baseball bat as deadly weapon).

¶ 49 Lastly, defendant argues that her conduct was merely reckless and compares her case to *People v. Eubanks*, 2019 IL 123525, wherein an intoxicated defendant drove in the dark without headlights on a residential street between 50 and 90 miles per hour and struck two pedestrians crossing the street between parked vehicles. *Eubanks*, 2019 IL 123525, ¶¶ 12-17, 20. He was convicted of, *inter alia*, first degree murder. *Id.* ¶ 1. Our supreme court found that the trial court abused its discretion in not giving a jury instruction on reckless homicide where a jury could have inferred that the defendant's mental state was reckless, not knowing, given the lack of traffic. *Id.* ¶¶ 81, 85. Where defendant drove her vehicle straight at Dugo after threatening to kill him, however, a rational trier of fact could find that she acted with the intent to kill him.

¶ 50 For these reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 51 Affirmed.